# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

R.J.W., : 
          Petitioner : 
           :   No. 836 C.D. 2015
    v. :   Submitted: February 12, 2016
           :   SEALED CASE
Department of Human Services, : 
          Respondent : 

BEFORE:   HONORABLE ROBERT SIMPSON, Judge
              HONORABLE MICHAEL H. WOJCIK, Judge
              HONORABLE DAN PELLEGRINI, Senior Judge

**OPINION**
**BY JUDGE SIMPSON**              **FILED: May 17, 2016**

      R.J.W. petitions for review from an order of the Department of Human Services (Department) that upheld an order of the Department's Bureau of Hearings and Appeals (BHA), which adopted a recommendation by an Administrative Law Judge (ALJ) denying R.J.W.'s request for expunction of an indicated report of child abuse under the Child Protective Services Law (CPS Law), 23 Pa. C.S. §§6301-6386. R.J.W. contends the ALJ erred in: (1) issuing an adjudication that is not supported by substantial evidence; (2) prohibiting the viewing and admission of videotape evidence of a forensic interview; and, (3) permitting the Department to amend a determination of "founded" child abuse to "indicated." Upon review, we affirm.

## I. Background
### A. Indicated Report of Sexual Abuse

In September 2011, the Washington County Office of Children and Youth Services (CYS) received a report of possible child abuse involving a child, L.F. (Child), and her father R.J.W.  Child is a female born in October 2006.  The alleged abuse occurred before the report was made, when Child was between four and five years old.

In October 2011, after its investigation, CYS filed an indicated report identifying R.J.W. as the perpetrator of child sexual abuse in the nature of sexual assault involving Child.[1]  Reproduced Record (R.R.) at 2a-3a.  R.J.W. appealed, and the BHA assigned an ALJ to hear the appeal.

### B. ALJ's Adjudication
#### 1. Findings

The ALJ held three days of evidentiary hearings at which CYS presented the testimony of Child, Child's mother, R.F. (Mother), Michelle McIntyre (McInyre), R.N., Emergency Service Practice Specialist at Washington Hospital, who serves as a sexual assault nurse examiner (SANE), Linda Chambers, R.N., an emergency room nurse who is also a SANE nurse,  Tamara Miller

---

[1] At the time the conduct at issue occurred here, Section 6303 of the CPS Law defined "child abuse" as, among other things, "[a]n act … by a perpetrator which causes … sexual abuse or sexual exploitation of a child under 18 years of age."  In turn, Section 6303 defined "sexual abuse or exploitation" as, among other things: "[t]he employment, use, persuasion, inducement, enticement or coercion of a child to engage in or assist another individual to engage in sexually explicit conduct. [or] [a]ny of the following offenses committed against a child: … (ii) Sexual assault. … (iv) Aggravated indecent assault. (v) Molestation. … (ix) Sexual abuse. ..." 23 Pa. C.S. §6303(1), (3)(ii),(iv), (v), (ix); see also 55 Pa. Code §3490.4. The definitions of "child abuse" and "sexual abuse or exploitation" set forth in 23 Pa. C.S. §6303 were amended by the Act of December 18, 2013, P.L. 1170, which became effective December 31, 2014.

(Miller), a licensed professional counselor, Amy Russell (Russell), M.S.Ed., J.D., NCC, Deputy Director of the National Child Protection Training Center, Jennifer Lytton (Lytton), a forensic interviewer for Washington County and Gina Zacios, a CYS caseworker. For his part, R.J.W. testified on his own behalf and presented as character witnesses the testimony of two friends and his girlfriend, as well as the testimony of Dr. Bruce Chambers, Ph.D., a licensed psychologist. The parties submitted briefs. The ALJ subsequently issued an adjudication recommending denial of R.J.W.'s appeal.

More particularly, based on the evidence presented, the ALJ found the following facts. In September 2011, CYS received a report of possible child abuse. A Child Protective Service Investigation Report alleged that incidents of abuse occurred between October 2010 and September 2011. The abuse allegedly included, "daddy [(R.J.W.)] rubs me and puts his fingers up inside of me." ALJ's Adj., 10/16/14, Finding of Fact (F.F.) No. 6 (quoting Ex. C-4). CYS made its decision to register R.J.W. based solely on Child's statements.

In November 2011, CYS referred Child to Southwestern Pennsylvania Human Services (SPHS) for an intake assessment. CYS made the referral based on "indicated" sexual abuse and for symptoms of "hyper-vigilance … crying, tearfulness[,] fear of sleeping in her own room, having night mares [sic], diurnal enuresis." F.F. No. 10 (quoting ALJ's Hearing, Notes of Testimony (N.T.), 3/7/12, at 108). Child underwent 10 sessions at SPHS in a therapeutic setting with Miller, an outpatient therapist and counselor.

Miller opined that, based on the symptoms Child displayed during her sessions, testifying at the hearing would cause Child emotional distress. Miller acknowledged that if Child testified while R.J.W. was not present, her distress would be relieved. The hyper-vigilance Miller observed in Child related to fear of certain people or places. In her sessions with Miller, Child avoided any conversations about R.J.W. and was fearful R.J.W. would harm her or Mother if Child disclosed anything. The fear expressed by Child extended to fear that her stuffed rabbit, Easter, would be damaged. Miller opined that conversations about the alleged abuse could trigger severe emotional distress in Child.

The ALJ ultimately determined that Child, who was five-years-old at the time of the hearings, was competent to testify. As a result, Child testified at the hearings. The ALJ stated that Child understood the difference between "what is real and what is not." F.F. No. 22 (citing N.T. at 128). When Child testified at the hearing, she stated clearly her "daddy" hurt her; he "licked her after he removed her clothing with his tongue on her arm, her leg and on her 'bum.'" F.F. No. 23 (quoting N.T. at 133). "When [Child] talked about her 'bum,' she pointed to her front genitalia." Id. Child refers to her "butt" as the part of her body that she sits on. F.F. No. 28 (quoting N.T. at 140). "[Child] disclosed that [R.J.W.] sticks his fingers up inside her and rubs her on her front genitals." F.F. No. 24 (citing N.T. at 134). Child testified that when R.J.W. "put his fingers inside of her that it hurt her." F.F. No. 25 (citing N.T. at 135). R.J.W. threatened to set Easter, Child's stuffed rabbit, on fire or to run Easter over with his truck if Child revealed the alleged abuse. "[R.J.W.] inappropriately touched [Child] when she was at his house and there were no other people around." F.F. No. 27 (citing N.T. at 137).

4

McIntyre, a SANE nurse, physically examined Child on September 15, 2011 at Washington Hospital. No one asked Child questions during her physical examination. However, Child made a spontaneous statement during the course of her physical examination. Prior to being asked to assist McIntyre with Child, Linda Chambers, R.N., had no experience with Child. The physical examination consisted of visual and swabbing of the outside of Child's genitals. When McIntyre placed Child in a position for examination, Child reached down and pushed her hand away and said: "Don't touch me there like Daddy does." F.F. No. 34 (quoting N.T. at 174). Child returned home after visiting R.J.W. on September 11, 2011. On September 12, 2011, in the evening, Child was taking a bath when Mother noticed her vaginal area was red.

From January through September 2011, R.J.W. had visitation with Child from 5:00 p.m. on Fridays until 8:00 p.m. on Sundays, every other weekend, and either Mondays or Thursdays from 5:00 p.m. until 8:30 p.m. Child became extremely upset when she had to visit R.J.W. for a weekend. Before Mother noticed the redness around Child's vagina, Child had nightmares and "wet the bed a lot" after she came home from a visit with R.J.W. F.F. No. 41 (citing N.T. at 212). Child's bed wetting occurred "after she was fully potty trained." F.F. No. 42 (citing N.T. at 214).

Mother corroborated that Child refers to her vaginal area as her "bummy" and her rectum as her "butt." F.F. No. 43 (quoting N.T. at 215). When Child was on the toilet or in the bathtub after she came home from a weekend visit with R.J.W., Child would spontaneously say "my bummy is itchy" or "my bum

5

hurts." F.F. No. 44 (quoting N.T. at 219). Mother related a story of Child's statements on September 12, 2011, as follows:

> And I went, and I got her pajamas and brought them in; and she was sitting on the bed. When she laid back, I kind of went to push her legs back like you would change a baby's diaper to look to see if it was red, if it was a rash.

> She completely -- she started screaming and crying and pushing my hands away and kicking at me, and I sat her up; and I said, 'Honey,' I said, 'What is the matter?' I said, 'I'm just looking to see -- you know, you might have a rash,' and she just continued to scream and cry; and she said, 'Please don't touch me there,' and I said, 'Touch you where, baby,' and she said, 'There.'

> And I said, 'I don't understand what you mean.' And she said, 'Please don't touch me there like my daddy does.' And I said, "What do you mean, 'like your daddy does?' I said, 'Nobody is allowed to touch you there,' I said, 'unless they're helping you get a bath or, you know, helping you wipe if you can't.' And she said, 'My daddy does.'

> And I said, 'Are you sure that he wasn't drying you off and maybe he scratched you or bumped you,' and she said 'No.' And I said, 'You need to show me or tell me exactly what it is that he does.'

> And she took her right hand, and she put it outside of the front of her; and she started rubbing herself and in-between there. And then she went to put her fingers inside of her, and I stopped her; and I said, 'Stop.'

F.F. No. 45 (quoting N.T. at 221-22).

On the same date, Mother brought Child to the Monongahela Valley Hospital Emergency Room for examination. On the way to the emergency room, Child questioned Mother, "Am I going to get shots?" and "Daddy said that I'm

6

going to get shots if I tell on him." F.F. No. 46 (quoting N.T. at 223). Before they arrived at the emergency room, Child vomited all over the rear of the vehicle.

The next day, Mother scheduled an appointment for Child for a forensic interview. Two days later, Lytton conducted a forensic interview. During the interview, Lytton made notes of her observations and notes of Child's statements. Child stated R.J.W. hit her in the face with the back of his hand. Child also stated R.J.W. touches her "bum" with his "nail." F.F. No. 53 (quoting N.T., 5/11/12, at 447). When Lytton identified body parts, Child pointed to her vaginal area and identified the area as her "bum." F.F. No. 54 (quoting N.T., 5/11/12, at 448). Child stated: "It was after her bath when her dad was drying her off. She said that her dad was drying her off when his nail touched her in the bum. She said that it stayed still." F.F. No. 55 (quoting N.T., 5/11/12, at 451).

For her part, Russell, the Deputy Director of the National Child Protection Training Center, agreed that by the way a forensic interviewer phrases her questions or by her body language, the interviewer has the power to suggest the desired responses. The forensic interview of Child was recorded, but the recording was maintained as confidential by the Washington County Child Advocacy Center (CAC). CYS did not introduce the recording into evidence during the hearings. Russell agreed that the fact that no recording of the forensic interview was presented made it difficult to assess the reliability of the information Child conveyed during the interview. Russell also agreed that, the younger the child, the greater the suggestibility. Additionally, she agreed younger children may be led to claim an event occurred when it was only suggested by the interviewer.

7

Ultimately, the ALJ found the testimony of Mother, Child and SANE nurse Linda Chambers credible.  F.F. Nos. 66, 68, 69.  The ALJ found the testimony of R.J.W. not credible.  F.F. No. 67.

**2. ALJ's Discussion**

The ALJ first observed that the three hearings in this case occurred before our Supreme Court reversed this Court's decision regarding the appropriate level of proof required to maintain a perpetrator's information on the ChildLine registry.  See G.V. v. Dep't of Pub. Welfare, 52 A.3d 434 (Pa. Cmwlth. 2012) (en banc), rev'd, 91 A.3d 667 (Pa. 2014)  The ALJ observed that another factor that affected the progress of this case were the criminal proceedings against R.J.W. in which he initially pled not guilty to multiple counts relating to sexual abuse of a child.  After the criminal trial commenced, R.J.W. agreed to plead *nolo contendere* to one count of endangering the welfare of a child.  Based on R.J.W.'s *nolo contendere* plea, CYS amended R.J.W.'s initial registration from "indicated" to "founded."

In order to understand why he ultimately decided this case on the merits of the "indicated" registration, the ALJ explained, it was necessary to understand how the case progressed.  In September 2011, CYS received a report of possible child abuse.  After investigating the report, CYS registered R.J.W. on ChildLine with an "indicated" status.  R.J.W. received notice of the "indicated" status, which he appealed, through counsel.

8

The BHA scheduled a hearing for January 2012 to determine whether the Department correctly registered R.J.W. with an "indicated" status. At CYS' request, the BHA moved the hearing to March 2012.

The ALJ held hearings over the course of three days in March, May and June 2012. In August 2012, the BHA notified CYS that this Court's decision in G.V., adopted a clear and convincing evidence standard for these proceedings, and the BHA offered CYS an opportunity to file a new brief or reargue the appeal based on the new standard. The BHA denied a motion to stay these proceedings pending the Supreme Court's resolution of the appeal in G.V.

Thereafter, the BHA stayed the proceedings pending resolution of the criminal proceedings involving R.J.W. In August 2013, the common pleas court accepted R.J.W.'s plea of *nolo contendere* to one count of endangering the welfare of a child. In turn, CYS amended R.J.W.'s registration status from "indicated" to "founded." CYS also requested that the BHA dismiss R.J.W.'s administrative appeal because the common pleas court accepted R.J.W.'s *nolo contendere* plea. R.J.W. responded that his *nolo contendere* plea was unrelated to the allegations of sexual abuse by CYS. The Department subsequently amended R.J.W.'s registration status from "indicated" to "founded." CYS notified R.J.W. that his registration status was changed from "indicated" to "founded."

The BHA then scheduled a hearing to determine whether R.J.W.'s "founded" registration status was correctly characterized. At the hearing, CYS failed to justify its decision to amend R.J.W.'s registration status, and it agreed to

have the appeal adjudicated on the merits of the "indicated" status. Thereafter, the Department again amended R.J.W.'s registration status from "founded" to "indicated." After the Department filed its brief, the ALJ closed the record.

As to the merits, the ALJ explained that the Department initially registered R.J.W. after an investigation based primarily on Child's statements taken at several different times and in several different settings. The ALJ stated Child was only four and five years old when she alleged R.J.W. inappropriately touched her "bum." ALJ's Adj. at 14. Child refers to her genitalia as her "bum." Id.

The ALJ explained that from January through September, 2011, Child visited R.J.W. on alternate weekends including overnight visits. Child became extremely upset when she had to visit her "daddy" on weekends in which she stayed over with him. Id. She would become upset; she would cry and vomit before she went for the visit. During the months Child stayed with R.J.W., when she returned home, she had nightmares, she would wake up screaming and at one point she stuttered. When Mother asked Child about her dreams, Child only cried.

Further, many times after Child returned from visiting R.J.W., she stated that her "bum" was itchy or sore. Id. On September 12, 2011, when Child was taking a bath, Mother noticed her genitals were red. The redness looked like a rash. After Child finished bathing, Mother placed Child on her bed to examine the rash. Child "screamed, hollered [and] kicked at [Mother] and pushed her hands away. She said 'please don't touch me there like my Daddy does.'" Id. When

10

Mother asked Child what she meant, Child took her right hand and started rubbing her genitals. When she started to put her fingers inside of her vagina, Mother stopped her. Id. As to this testimony, the ALJ stated: "I believe this occurred. I believe [Child] made the oral statement without prompting by [Mother]. My belief is corroborated by the fact that [Mother] took [Child] on September 12, 2011 to the Mon Valley Emergency Room for an examination." Id. (emphasis added).

On the way to the hospital, Child asked whether "she was going to get shots and vomited in the car." Id. The ALJ stated: "I interpret the reaction to mean that [Child] was frightened about something. [Mother] testified that [Child] told her that her Daddy told her that she would get shots if she told on him. I find that [Child's] fear could easily be attributed to that kind of threat." Id.

After Child was examined at the hospital, she was scheduled for a forensic interview, which occurred at the CAC by Lytton. Lytton made an audio-video recording of the interview; however, CYS did not request the recording from CAC, and the recording was not used as evidence during the hearings. The ALJ explained that, generally, CAC does not provide recordings of interviews absent an order from a common pleas court. The ALJ further stated the recording was not in CYS' possession nor was it used as evidence by CYS at the hearings.

Counsel for R.J.W. objected to Lytton's testimony on the ground that he was not provided with a copy of the recording of the interview. R.J.W. argued he was prejudiced by the witness because there was no way for Dr. Chambers, his expert, to analyze Lytton's interview style. The ALJ overruled the objection on the

11

ground that the forensic interviewer was present, and she testified about Child's statements and behavior during the interview. The ALJ permitted R.J.W. to conduct extensive cross-examination of Lytton. The ALJ overruled R.J.W.'s objection because "after a child has testified at a hearing her hearsay may be admitted … once the child has been determined competent to testify and … testifies at the expunction hearing." Id.

Here, the ALJ found Child was competent, and she testified at the hearing. The ALJ found Child's hearsay statements to Ms. Lytton were admissible "as they would be if she made them to Mother or another person." Id. However, the ALJ further gave Child's hearsay statements little weight as they were only corroborative of Child's statements and demeanor as observed by others. The ALJ stated: "It was not so much what [Child] said but what [Child] did that provided substantial evidence of the correctness of [CYS'] decision to register [R.J.W.]." Id.

The ALJ further explained that, after her interview, McIntyre, a SANE nurse, examined Child at the hospital. Linda Chambers, R.N., assisted McIntyre. Chambers' job was to distract Child so McIntyre could more easily examine Child. The examination consisted of a visual examination of Child's genitals and some external swabs in the genital area. During the examination, Child was fussing and crying. She reached down and tried to push McIntyre's hands away. She said, "Don't touch me there like Daddy does." Id. at 16. The ALJ credited Linda Chambers' observations of Child's actions to prevent being

12

examined as well as her recollection of Child's statement. Linda Chambers had no prior relationship with Child or Mother and asked Child no questions.

The ALJ also explained that, at the recommendation of CYS, Mother placed Child into therapy. Miller of SPHS was Child's therapist. CYS referred Child for therapy subsequent to sexual abuse. Mother also believed therapy was necessary based on Child's symptoms of hyper-vigilance, crying, fear of sleeping in her own room, nightmares and bed wetting. The ALJ explained that hyper-vigilance is a sign of a person suffering some prior distress. Other symptoms that show Child suffered distress were that she would avoid topics related to the cause of the distress; thus, she would avoid topics related to R.J.W. Child was afraid R.J.W. would harm her or Mother if she disclosed any information regarding the cause of her distress.

Miller also disclosed that R.J.W. caused Child's distress. Child's emotional distress when presented with conversations about what occurred was severe. The ALJ stated:

> [Child's] avoidance of any topic related to her father, her demonstrated fear that her father might harm her or [Mother], her tantrums related to anybody touching her 'bum[,]' the fact that [Child's] vagina was red and sore after she visited with her father; and, [Child's] bed wetting and nightmares after visiting with her father all provide corroboration that her statement, 'Don't touch me there like Daddy does,' was not coached or a product of taint. The statement related something that had occurred.

Id.

13

In addition, the ALJ explained, at the hearing, Child showed she understood the difference between fact and fiction. The ALJ permitted Child to testify with the provision that if she became uncommunicative, she would be excused to avoid traumatizing her. The ALJ excluded R.J.W. from the hearing during Child's testimony because Child's therapist opined that he might cause her distress. Child's relevant testimony was that her daddy hurt her. He licked her on her arm, her leg, and on her "bum." Id. Child referred to her vagina as her bum. When asked, Child correctly pointed to her arm, leg and to front genitals. Child testified she was wearing clothes when R.J.W. licked her, but R.J.W. removed them. Child testified R.J.W. licked her more than once. The ALJ stated:

> [Child] also testified [R.J.W.] sticks his fingers up inside of her and rubbed her and he pushed her. [Child] pointed to her front genitals when she identified the part that [R.J.W.] rubbed. [R.J.W.] touched her when she was at his house. If R.J.W. were in the room, it would make [Child] sad because he hurt her. Even under significant cross-examination, [Child] restated that [R.J.W.] 'sticked his fingers up inside me.' [Child's] testimony, in light of her previous observed demeanor when she was talking about [R.J.W.] or when someone was examining her, was credible.
>
> Consistent with my analysis above, I find that the Department was correct when it registered [R.J.W.] on ChildLine with an 'indicated' status.

Id. at 16-17 (emphasis added).

The BHA subsequently entered an order adopting the ALJ's adjudication in its entirety. In response, R.J.W. filed an application for reconsideration, which the Department granted. After reconsideration, the

Department's Acting Secretary issued an order upholding the BHA's order for the reasons the BHA stated. R.J.W. now petitions for review to this Court.

## II. Issues

On appeal,[2] R.J.W. presents three issues. First, he contends the ALJ's decision is not supported by substantial evidence, and this Court should disturb the ALJ's findings as to weight and credibility on appeal. Additionally, R.J.W. asserts the ALJ committed an error of law or abuse of discretion in prohibiting the viewing and admission of videotape evidence of Child's forensic interview. Finally, R.J.W. argues the ALJ committed an error of law or abuse of discretion by permitting the Department to amend a determination of "founded" child abuse to "indicated."[3]

## III. Discussion
### A. Substantial Evidence
#### 1. Contentions

R.J.W. first argues CYS did not meet its burden of proving an indication of child abuse by substantial evidence. He contends that an individual may only be registered as an indicated child abuser if an investigation by the Department or county agency determines that substantial evidence of the alleged abuse by a perpetrator exists based on any of the following: (i) available medical

---

[2] Appellate review of an agency decision is limited to determining whether the agency's findings were supported by substantial evidence, whether the agency committed an error of law, or whether the agency violated the appellant's constitutional rights. G.V. v. Dep't of Pub. Welfare, 91 A.3d 667 (Pa. 2014).

[3] R.J.W. is represented by different counsel on appeal than he was during the hearings below.

evidence; (ii) the child protective service investigation; or, (iii) an admission of the acts of abuse by the perpetrator. 23 Pa. C.S. §6303 (defining "indicated report"); see also 55 Pa. Code §3490.4. Here, R.J.W. asserts, CYS presented no medical evidence nor did R.J.W. admit to the acts of abuse. Thus, CYS had the burden of proving, by substantial evidence, that its investigation revealed substantial evidence to register R.J.W. as an indicated child abuser.

R.J.W. points out that Section 6303 of the CPS Law defines "substantial evidence" as "[e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion." Id. He contends the accuracy of the evidence presented, preserved for the record and documented for appellate review is paramount in the determination. Expungement of an "indicated" registration is required if the registration is inaccurate or maintained in a manner inconsistent with the CPS Law. 23 Pa. C.S. §6341(a)(2).

R.J.W. argues CYS bore the burden of proving, by substantial evidence, that the "indicated" report was accurate. See Bucks Cnty. Children & Youth Servs. Agency v. Dep't of Pub. Welfare, 808 A.2d 990, 993 (Pa. Cmwlth. 2002). Thus, the evidence an agency presents must outweigh all contrary evidence, see 23 Pa. C.S. §6303; C.F. v. Dep't of Pub. Welfare, 804 A.2d 755 (Pa. Cmwlth. 2002); and, the ALJ must undertake a "weighing dynamic" in his adjudication to assess both the evidence presented by the agency and the contradictory evidence, as well as the credibility of witnesses presented by both parties. A.P. v. Dep't of Pub. Welfare, 98 A.3d 736, 743 (Pa. Cmwlth. 2014). Because an appellate court may not reweigh or examine credibility determinations,

16

"[i]t is the factfinder's job to make and explain credibility determinations when conducting the 'weighing dynamic' required by 23 Pa. C.S. § 6303(a). Further, in discharging that duty the factfinder must consider all the named perpetrator's evidence that conflicts with the county's evidence." Id. at 744.

Here, R.J.W. argues, even the most cursory reading of the ALJ's adjudication, which the BHA adopted in its entirety, and, ultimately as a final order by the Department's Secretary, reveals the ALJ did not discharge his duty pursuant to Section 6303(a) of the CPS Law and this Court's decision in A.P. R.J.W. contends that, at not a single instance throughout the entire adjudication, did the ALJ relate the evidence R.J.W. presented—not even that R.J.W. denied the sexual misconduct ever occurred. R.J.W. asserts the ALJ further ignored the following salient points, which he made during his case-in-chief:

- [R.J.W.] and Mother were going through a bitter custody dispute when the allegations of sexual abuse were made;

- [R.J.W.] and [Child] had a loving and fruitful father/daughter relationship;

- Three witnesses testified on [R.J.W.'s] behalf as to [R.J.W.'s] character and relationship with [Child], as well as their own, personal interactions with [R.J.W.] and Child;

- Dr. Chambers, [R.J.W.'s] expert witness regarding forensic examinations, severely doubted the veracity of the allegations given the known interview techniques and the inability for anyone to view a video recording of the forensic interview; and

- [R.J.W.'s] belief that Mother had coached [Child] into making the accusations regarding sexual abuse.

17

Br. for Pet'r at 24-25. Indeed, R.J.W. contends, the ALJ summed up the entirety of the evidence and testimony R.J.W. presented as follows: "[R.J.W.] did not testify credibly." F.F. No. 67.

R.J.W. argues that in A.P., this Court found such a "capricious disregard of evidence" mandates, at a minimum, vacating and remanding to the ALJ for a complete and thorough weighing of all the evidence presented. Id. at 745. R.J.W. asserts the ALJ's capricious disregard of record evidence here is even more egregious than that of the ALJ in A.P. Here, R.J.W. argues, there was no analysis, no relation of testimony, no weighing of contrary evidence. Instead, the ALJ simply stated: "[R.J.W.] did not testify credibly." F.F. No. 67. Such a finding, without anything more, is the very definition of "[a] dismissal of one side's evidence with a conclusory credibility determination." A.P., 98 A.3d at 745.

R.J.W. further contends this Court can review the record as a whole and determine CYS did not meet its burden, without disturbing the ALJ's credibility determinations, because the accuracy of the indicated report is highly questionable and therefore not supported by substantial evidence. R.J.W. acknowledges the testimony of the alleged victim alone is sufficient to constitute substantial evidence. See G.S. v. Dep't of Pub. Welfare, 521 A.2d 87 (Pa. Cmwlth. 1987). However, he argues, because CYS did not have medical evidence or an admission from R.J.W., CYS had the burden to prove by substantial evidence that its investigation was sufficient to register R.J.W. Even placing Child's testimony on the pedestal that the ALJ did, R.J.W. argues, the investigation, as relayed at the hearing, was rife with flaws.

First, R.J.W. contends, not a single investigator, nor R.J.W. or his expert, Dr. Chambers, viewed the videotape of the forensic interview. The ALJ, citing the testimony of CYS' expert, Russell, found as fact that the lack of a "video or audio recording of the … forensic interview … introduced as evidence makes it difficult to assess the reliability of the information conveyed at the interview by [Child]." F.F. No. 59 (citing N.T. at 323). The ALJ, again citing Russell's testimony, further determined that the younger the child, the higher the risk of suggestibility, and younger children "may be led to claim that an event occurred when it was only a suggestion by the interviewer." F.F. Nos. 60-61 (citing N.T. at 324). R.J.W. contends CYS filed the indicated report immediately after the forensic interview, and CYS bore the burden of proving the accuracy of the indication as determined by its investigation. R.J.W. argues these findings by the ALJ reveal that CYS' investigation was inaccurate, and therefore reversal is mandated. Bucks Cnty. Child. & Youth Servs. Agency.

In addition, R.J.W. argues, Child's testimony is full of inconsistencies. R.J.W. asserts Child's credibility, which cannot be assailed on appeal, is different than the accuracy of her testimony, particularly where Child's testimony alone may sustain CYS' burden. R.J.W. contends on multiple occasions during cross-examination, Child testified she did not know what words such as "rub," "inside," "lick," "hurt" or "touch" mean. N.T. at 144-45, 150. Child also testified she was "a baby" and "one" year-old when the alleged abuse occurred. Id. at 141-42. Child further testified R.J.W. performed the abusive acts of "touching [and] rubbing" while she and R.J.W. were around "all kinds of other people" at an amusement park. Id. at 152-53. R.J.W. argues the entirety of CYS' investigation

19

accused R.J.W. of "rubbing" Child's vaginal area, sticking his fingers "inside" of her, "hurting" and "touching" Child, and "licking" Child on the arm and leg, based solely on Child's statements. F.F. No. 7. However, R.J.W. asserts, Child credibly (see F.F. No. 66) testified she did not know the meaning of those words. Again, R.J.W. argues, even assuming proper credibility determinations, CYS did not meet its burden, and reversal is required.

## 2. Analysis

In an expunction case, the county agency bears the burden of proof regarding the accuracy of the report. A.O. v. Dep't of Pub. Welfare, 838 A.2d 35 (Pa. Cmwlth. 2003). To that end, the burden is on the appropriate county agency to show the indicated report of abuse is accurate and is maintained in a manner consistent with the CPS Law. G.V. v. Dep't of Pub. Welfare, 91 A.3d 667 (Pa. 2014). The proper standard of proof is preponderance of the evidence, which is the lowest standard and is tantamount to a "more likely true than not" inquiry. In re S.H., 96 A.3d 448, 455 n.7 (Pa. Cmwlth. 2014). Pursuant to the CPS Law, "[s]ubstantial evidence" is "[e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion." 23 Pa. C.S. §6303(a); accord G.V. Thus, to reach a conclusion of abuse, the "evidence must so preponderate in favor of a conclusion that it outweighs ... any inconsistent evidence and reasonable inferences therefrom." S.H., 96 A.3d at 453 n.4 (Pa. Cmwlth. 2014) (citation omitted). Whether the evidence satisfies the standard is a question of law. Id.

Further, in order for the agency to establish the accuracy of the indicated report, it must present substantial evidence of the alleged abuse in the form of: (1) available medical evidence; (2) a CPS investigation; or, (3) an admission of the acts of abuse by the perpetrator. 23 Pa. C.S. §6303(a). Hearsay testimony, in conjunction with admissible corroborative testimony of the acts in question, "can [as a whole], constitute substantial evidence which will satisfy the [a]gency's burden to justify a conclusion of abuse." In re E.A., 82 A.3d 370, 381-82 (Pa. 2013) (citation omitted).

To that end, the use of out-of-court statements by children in expungement cases is controlled by our Supreme Court's decision in A.Y. v. Department of Public Welfare, 641 A.2d 1148 (Pa. 1994). In A.Y., the Court applied the statutory hearsay exception for dependency cases to cases brought under the CPS Law and set forth the standard for admission of hearsay in expungement proceedings. E.A. It adopted the following guidelines:

> 1. Hearsay testimony of a child victim will be admitted in accordance with the standards set forth in 42 Pa. C.S. § 5986, and this rule shall be applied to permit the testimony of the victim's parents and other family members as well as those professionals charged with investigating incidents of child abuse;
>
> 2. Hearsay testimony in conjunction with admissible corroborative evidence of the act(s) in question can *in toto* constitute substantial evidence which will satisfy the [a]gency's burden to justify a conclusion of abuse;
>
> 3. However, *uncorroborated* hearsay cannot satisfy the [a]gency's burden unless it comports with the following requirements:

a) the statement was accurately recorded by audio or video equipment;

b) the audio-visual record discloses the identity and at all times included the images and/or voices of all individuals present during the interview of the minor; and

c) the statement was not made in response to questioning calculated to lead the minor to make a particular statement and was not the product of improper suggestion.

A.Y., 641 A.2d at 1153 (emphasis in original); accord E.A., 82 A.3d at 381.

Notably, in expungement cases, the testimony of the victim alone constitutes substantial evidence to support an indicated report of child abuse. D.T. v. Dep't of Pub. Welfare, 873 A.2d 850 (Pa. Cmwlth. 2005) (citing G.S. v. Dep't of Pub. Welfare, 521 A.2d 87 (Pa. Cmwlth. 1987)). Here, the BHA adopted the ALJ's adjudication in its entirety. BHA Order, 10/24/14; Pet'r's Br. at Ex. B. In so doing, it found Child a competent and credible witness. F.F. No. 66; ALJ's Adj. at 16.

Further, based on his resolution of issues of witness credibility and evidentiary weight, the ALJ set forth the following analysis (with emphasis added):

The Department registered [R.J.W.] subsequent to an investigation based primarily on statements of [Child] taken at several different times and in several different forums. [Child] is young. She was only four years old and five years old when she alleged that her father had inappropriately touched her 'bum.' [Child] refers to her genitalia as her 'bum.' [R.J.W.] makes a strong argument that [Child's] statements were a product of suggestion by [Mother] and by improper interviewing techniques. While I agree with [R.J.W.'s] position that [Child's] statements could have been tainted by [Mother],

22

after a careful review of her testimony and spontaneous statements, I find [Child] credible. [Child's] observable reaction to the stimulus of someone trying to examine her genitals speaks volumes. Her observable reaction when she was being sent for a weekend to her father's is illustrative of fear of something.

From January 2011 until about September, 2011 [Child] visited her father's [home] on alternate weekends including overnight visits. [Child] became extremely upset when she had to visit her 'daddy' on weekends where she stayed over. She would become upset; she would cry and vomit before she went for the visit. During the months that [Child] stayed over at her father's, when she returned home, she had nightmares, she would wake up screaming and at one point she stuttered. When [Mother] asked her about her dreams [Child] only cried. She wet the bed 'a lot.' Before she started visiting her father, [Child] was fully potty trained.

Many times when [Child] returned from visiting her father, she said that her 'bum' was itchy or that it was sore. On September 12, 2011 when [Child] was taking a bath, [Mother] noticed that [Child's] genitals were red. The redness looked like a rash. After [Child] had finished bathing, [Mother] put her on her bed to examine the rash. [Child] screamed, hollered, kicked at [Mother] and pushed her hands away. She said 'please don't touch me there like my Daddy does.' When [Mother] asked what she meant, [Child] took her right hand and started rubbing her genitals. When she started to put her fingers inside of her vagina, [Mother] stopped her. I believe this occurred. I believe [Child] made the oral statement without prompting by [Mother]. My belief is corroborated by the fact that [Mother] took her on September 12, 2011 to the Mon Valley Emergency Room for an examination.

On the way to the hospital, [Child] asked whether she was going to get shots and vomited in the car. I interpret the reaction to mean that [Child] was frightened about something. [Mother] testified that [Child] told her that her Daddy told her that she would get shots if she told on him. I find that [Child's] fear could easily be attributed to that kind of threat.

* * * *

23

After her interview, [Child] was examined at the Washington Hospital by [McIntyre] a [SANE nurse]. [McIntyre] was assisted by another registered nurse, L. Chambers. L. [Chambers'] job was to distract [Child] making it easier for [McIntyre] to examine her. The examination consisted of a visual examination of [Child's] genitals and some external swabs in the genital area. While she was being examined [Child] was fussing and crying. She reached down and tried to push [McIntyre's] hands away. She said, 'Don't touch me there like Daddy does.' L. [Chambers'] observations of [Child's] actions to prevent being examined and her recollection of [Child's] statement as they were related by her testimony are credible. [Chambers] had no previous relationship with [Child] or [Mother] and asked [Child] no questions.

At the recommendation of CYS[,] [Mother] put [Child] into therapy. [Miller] … was [Child's] therapist. … [Child] was brought to SPHS for intake assessment. She was referred by CYS for therapy subsequent to sexual abuse and by [Mother] for symptoms of hyper-vigilance, crying, fear of sleeping in her own room, nightmares, and bed wetting. Hyper-vigilance is a sign of a person having suffered some prior distress. Other symptoms that show [Child] had suffered distress were that she would avoid topics related to the cause of the distress. [Child] avoided topics related to her father. [Child] was afraid that she or [Mother] would be harmed if she disclosed anything about the cause of her distress. [Child's] therapist disclosed that [Child's] father was the cause of her distress. [Child's] emotional distress when presented with conversations about what happened was severe.

[Child's] avoidance of any topic related to her father, her demonstrated fear that her father might harm her or [Mother], her tantrums related to anybody touching her 'bum', the fact that her vagina was red and sore after she visited with her father, her bed wetting and nightmares after visiting with her father all provide corroboration that her statement, 'Don't touch me there like Daddy does,' was not coached or a product of taint. The statement related something that had occurred.

At the hearing, [Child] showed that she understood the difference between … fact and fiction. She was permitted to

24

testify with the provision that if she became uncommunicative, she would be excused to avoid traumatizing her. [R.J.W.] was excluded from being within the sight of [Child] because her therapist opined that he might cause her distress. Her relevant testimony was that her daddy had hurt her. He licked her on her arm, her leg, and on her 'bum.' [Child] referred to her vagina as her bum. When asked, [Child] pointed correctly to her arm, her leg and to her front genitals. When he licked her, [Child] testified that she was wearing clothes but that her father had removed them. [Child] testified that her father had licked her more than one time. She also testified that he sticks his fingers up inside of her and rubbed her and he pushed her. [Child] pointed to her front genitals when she identified the part that her father rubbed. Her father touched her when she was at his house. If her father were in the room, it would make [Child] sad because he hurt her. Even under significant cross-examination, [Child] restated that her father 'sticked his fingers up inside me.' [Child's] testimony, in light of her previous observed demeanor when she was talking about her father or when someone was examining her, was credible.

ALJ's Adj. at 14-16.

In adopting the ALJ's adjudication, the BHA became the final fact-finder in this expunction appeal. F.V.C. v. Dep't of Pub. Welfare, 987 A.2d 223 (Pa. Cmwlth. 2010). Absent an abuse of discretion, we will not disturb the BHA's determinations as to credibility and evidentiary weight. Id. Here, the BHA found Child's testimony credible with respect to the acts of sexual abuse R.J.W. perpetrated on her. ALJ's Adj. at 20. As such, Child's testimony regarding the incidents of abuse, by itself, constitutes substantial evidence to sustain CYS' indicated report of child abuse. D.T.; G.S.

In addition, although R.J.W. maintains that Child's testimony on cross-examination was full of inconsistencies, Child, who was five-years-old at the

time of the ALJ's hearing, offered the following clear testimony on direct examination:

Q. Do you know why you're here today?
A. Because my daddy hurt me.

Q. Can you say it just so I can hear you?
A. Because my daddy hurt me.

Q. Your daddy --
A Hurt me.

Q. -- hurt you. Can you tell me about that?
A. He licked me.

Q. Do you know where he licked you?
A. On the arm, the leg, and the bum.

Q. What was the first part?
A. The arm and the leg and the bum.

Q. Can you show me on your body where those parts are? Where is your arm?
A. Right here (indicating).

Q. Okay. Where is your leg?
A. (Indicating.)

Q. Where is your bum?
A. (Indicating.)

Q. And you're pointing to the front part of you?
A. (Indicating.)

THE COURT: That was a nod for yes.

Q. Do any of those -- are any of those areas that you pointed to, your arm, your leg, or your bum, are any of those what you might -- are those areas that other people can touch?
A. Yes.

26

Q. Okay. And are those areas of your body that we cover or don't cover with clothes?
A. Cover.

Q. Okay. All right. And can you tell me -- you said that your dad licked you?
A. (Indicating.)

Q. What did he lick you with?
A. With his tongue.

Q. Where on your arm did he lick you?
A. (Indicating.)

THE COURT: For the record, the child is pointing to her forearm.

Q. Where on your leg did he lick you?
A. (Indicating.)

THE COURT: For the record, the child is pointing to her lower leg.

Q. Where on your bum did he lick you?
A. (Indicating.)

THE COURT: Pointing to front private parts, genitals.

Q. Were you wearing clothes or not wearing clothes?
A. I was wearing clothes.

Q. When he licked you with his tongue, did he lick your clothes or lick your skin?
A. Lick my skin.

Q. Did he do anything to your clothes to be able to lick your skin?
A. He pulled them down.

Q. … did this happen one time or more than one time?
A. More than one time.

Q. Has your dad ever hurt you in any other way?

27

A. Yes.

Q. How?
A. He sticks his fingers up inside me and rubs me and pushed me.

Q. I heard 'pushed' you, but I didn't hear the part that was before it.
A. Rub.

Q. Whooped?
A. No, rub.

Q. Rubbed. Where did your dad rub you?
A. On the bum.

Q. Can you show me where on your bum?
A. (Indicating.)

        THE COURT: For the record, pointing to genitals, front.

Q. When you say your dad placed his fingers up inside you, where on your body is that?
A. (Indicating.)

        THE COURT: Pointing again to genitals, front.

Q. Do you have a name for that part? Do you call it something?
A. Bum.

Q. You also said that your dad pushed you?
A. Uh-hmm.

Q. Where did he push you? Did he push you on your body?
A. Uh-hmm.

Q. Where?
A. On my face.

Q. When these things happened, when your dad licked your arm or your leg or your bum, did that hurt you?
A. No.

28

Q. When your dad put his fingers up inside of you, did that hurt you?
A. Yes.

Q. Can you tell me about that?
A. Yes.

Q. How did it hurt? Can you tell me? When your dad rubbed you, did that hurt?
A. Yes.

Q. When your dad pushed you on your face, did that hurt?
A. No.

Q. Did your dad say anything to you when he touched you in these different ways?
A. Yes.

Q. What did he say?
A. He said he was going to set Easter on fire.

Q. He was going to set Easter on fire?
A. Um-hmm.

Q. Who is Easter?

THE COURT: I'll get him. Here (indicating) is Easter.

Q. Who is Easter?
A. Easter -- this (indicating) is Easter.

Q. Okay. He is your stuffed rabbit?
A. Uh-hmm.

Q. Did that make you happy or sad or something else?
A. Happy.

THE COURT: Explain your question, please.

Q. If Easter was set on fire -- when your dad said that he was going to set Easter on fire, did that make you happy or sad or something else?
A. Sad.

29

Q. Why?
A. Because I love Easter.

Q. Did your dad say anything else to you at any time that he touched you in these ways?
A. He was going to run Easter over with his truck.

Q. When your dad said that he would run Easter over with his truck, did that make you happy, sad, or something else?
A. Sad.

Q. Because you love Easter?
A. (Indicating.)

Q. Is there any other way that your dad has touched you or hurt you?
A. No.

Q. Did you want those touches?
A. No.

Q. Did you say anything to your dad when he would touch you?
A. Uh-uh.

Q. Do you know where you were when you were touched?
A. Yes.

Q. Where were you?
A. At his house.

Q. Did all of these touches happen at his house or somewhere else?
A. All of –

Q. Did it happen when it was just you and your dad at his house, or were there other people?
A. Yeah. There weren't other people.

Q. Did it happen when you were visiting with your dad or sometime else?
A. Something else.

Q. Do you live with your dad?

30

A. No.

Q. How did you get to see your dad before? Do you go there sometimes, or did you go there sometimes?
A. Yes.

Q. If your dad was in the room, would that make you happy, sad, or something else?
A. Sad.

Q. Why?
A. Because he hurt me.

Q. Because why?
A. Because he hurt me.

N.T. at 131-38. Additionally, as the ALJ explained, "[e]ven under significant cross-examination, [Child] restated that her father 'sticked his fingers up inside me.'" ALJ's Adj. at 16; see N.T. at 149. Further, where, as here, a witness actually testifies before an ALJ, the judge may base his credibility determinations on the demeanor of the witness. W.G. v. Dep't of Human Servs. (Pa. Cmwlth., Nos. 231, 615 C.D. 2015, filed November 10, 2015) (unreported)[4] (citing Daniels v. Workers' Comp. Appeal Bd. (Tri-State Transp.), 828 A.2d 1043 (Pa. 2003)).

Moreover, "the ALJ is free to accept or reject the testimony of any witness … in whole or in part, and determinations regarding credibility and weight of the evidence are within the province of the ALJ." DePaolo v. Dep't of Pub. Welfare, 865 A.2d 299, 305 (Pa. Cmwlth. 2005). Thus, the ALJ was free to credit Child's testimony on direct examination, excerpted at length above. Of further

---

[4] Pursuant to Commonwealth Court Internal Operating Procedure 414, 210 Pa. Code §69.414, an unreported panel decision of this Court, issued after January 15, 2008, may be cited for its persuasive value.

31

import, Child's account of the sexual abuse was directly corroborated by SANE nurse Linda Chambers, see N.T. at 174, therapist Tamara Miller, see N.T. at 116, forensic interviewer Jennifer Lytton, see N.T. at 447-48, 451-52, and Mother, see N.T. at 221-24.

In addition, as noted above, Section 6303(a) of the CPS Law instructs that the standard for evidence presented in an expunction hearing is "[e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion." 23 Pa. C.S. §6303(a). In A.P., this Court explained this statutory standard incorporates a "weighing dynamic" that goes beyond a traditional deferential substantial evidence review. Id. at 742-43. In order for the Department to maintain an indicated report of abuse, the evidence of abuse must outweigh contrary evidence. Id. The ALJ adequately employed this "weighing dynamic" in reaching his decision here when he credited the testimony of Child, Mother and Linda Chambers, see F.F. Nos. 66, 68, 69, over the contrary evidence presented by R.J.W. See F.F. No. 67. To that end, the ALJ expressly rejected R.J.W.'s testimony, including his denial of the allegations of abuse levied against him. F.F. No. 67.

Further, the party alleging a child witness' testimony is tainted bears the burden of production of evidence of taint and the burden of persuasion to establish it. Commonwealth v. Delbridge, 855 A.2d 27 (Pa. 2003). Here, the ALJ expressly rejected R.J.W.'s claims that Child's testimony was tainted (which Mother directly refuted, see N.T. at 227-29) and provided his reasons for doing so. See ALJ's Adj. at 14. No error is apparent in this regard.

32

Moreover, contrary to R.J.W.'s assertions, "[a]n ALJ is not required to address all the evidence that is presented." Carbon Cnty. Children & Youth Servs. v. Dep't of Pub. Welfare (Pa. Cmwlth., No. 533 C.D. 2014, filed October 19, 2015) (unreported) (Leavitt, J.), slip op. at 31, 2015 WL 6473008 at *15 (citing A.P., 98 A.3d at 744; Pistella v. Workmen's Comp. Appeal Bd. (Samson Buick Body Shop), 633 A.2d 230, 234 (Pa. Cmwlth. 1993) (factfinder must "make crucial findings of fact on all essential issues necessary for [appellate] review ... but is not required to address specifically each bit of evidence offered")). Here, in his findings of fact and discussion the ALJ adequately addressed the evidence necessary to arrive at his conclusion that denial of R.J.W.'s request for expunction of the indicated report of child abuse was proper.

In addition, we reject R.J.W.'s reliance on A.P. as that case is distinguishable. A.P. involved allegations of sexual abuse by a child against his uncle, which allegedly occurred when the child was 13-years-old, but which the child did not report until 5 years later. At hearings on the uncle's expunction request, the county agency presented the testimony of its investigator, the child and the child's parents. In response, the uncle testified and presented the testimony of his former girlfriend, the child's cousin, the child's paternal grandmother and the child's two paternal uncles. Ultimately, the ALJ credited the testimony of the child and his parents and rejected the testimony of the child's uncle and his witnesses. The ALJ found the child's testimony was sufficient to support a determination that the uncle was a perpetrator of abuse.

On appeal, this Court concluded the ALJ did not undertake the "weighing dynamic" required by 23 Pa. C.S. §6303(a) in issuing his adjudication. Id. at 744. We explained the ALJ did not consider all the evidence in conflict with the child's statement or adequately explain his credibility determinations. Specifically, the ALJ capriciously disregarded the cousin's testimony that she expected the child to confide in her and affirm his abuse claims, but he did not do so.

In addition, we determined the ALJ utilized an impermissible "double standard" when assessing the evidence by, among other things: (1) rejecting the uncle's witnesses because of a perceived familial bias but not invoking the concept of familial bias against the child's parents; (2) rejecting the testimony of the uncle's girlfriend as biased even though the girlfriend and the uncle had not dated for several years; (3) criticizing the uncle for not presenting testimony by the child's teachers or friends as to the child's reputation despite the fact that the county, not the uncle, bore the burden of proof; and, (4) finding the child's testimony "clear" despite deficiencies and lapses in memory, which the ALJ attributed to the passage of time while, at the same time, finding the uncle's inability to remember details fatal to his credibility. Id. at 744-45. In light of these deficiencies, we vacated and remanded for consideration of the record in accordance with the required statutory weighing dynamic. We directed the ALJ to undertake this weighing of the evidence with reference to demeanor and substance of the testimony. We also stated a dismissal of one side's evidence with a conclusory credibility determination was insufficient.

Here, unlike in A.P., the ALJ adequately employed the statutory "weighing dynamic" standard when he determined that the testimony of Child, which was corroborated by SANE nurse Linda Chambers, therapist Tamara Miller, forensic interviewer Jennifer Lytton, and Mother outweighed the inconsistent evidence presented by R.J.W. As indicated above, the ALJ provided a detailed analysis that was sufficient to resolve the issues raised. Additionally, unlike the testimony of the child in A.P., the testimony of Child in this case was amply corroborated.

Finally, unlike in A.P., the ALJ here did not simply dismiss R.J.W.'s evidence with a conclusory credibility determination. Rather, the ALJ specifically considered R.J.W.'s position that Child's statements could have been tainted by Mother. The ALJ made an extensive analysis of the evidence regarding R.J.W.'s position, most of which related to Child's conduct viewed by others. The ALJ explained reasons for expressly rejecting R.J.W.'s "taint" contention.

## B. Videotape of Forensic Interview
### 1. Contentions

R.J.W. next argues CYS improperly withheld probative evidence from the agency file: a videotape of Child's forensic interview. He asserts the ALJ, in turn, refused to mandate the turning over of the videotape or any other appropriate sanction. R.J.W. maintains both actions violate the CPS Law as well as guarantees of due process under the Pennsylvania Constitution. Thus, he contends, if this Court does not reverse the BHA's order denying his expunction request, a remand is required with an order directing CYS to turn over the videotape.

## 2. Analysis

Due process principles apply to administrative proceedings, and require an opportunity, among other things, to hear the evidence adduced by the opposing party, cross-examine witnesses, introduce evidence on one's own behalf, and present argument. D.Z. v. Bethlehem Area Sch. Dist., 2 A.3d 712 (Pa. Cmwlth. 2010). As our Supreme Court explained, "there must be notice, an opportunity to present one's cause, a proceeding appropriate to the character of the particular case, and an adjudication of the same nature as is present in other cases. Where these things are present there is due process of law." Id. at 720 (citing Petition of Kariher, 131 A. 265, 270 (Pa. 1925)).

The concept of due process is a flexible one and imposes only such procedural safeguards as the situation warrants. Id. Demonstrable prejudice is a key factor in assessing whether procedural due process was denied. Id.

In addition, "[t]ypically, questions concerning the admission or exclusion of evidence in an administrative proceeding are within the discretion of the tribunal conducting the hearing and are not to be disturbed on appeal absent a finding of abuse of discretion." D'Alessandro v. Pa. State Police, 937 A.2d 404, 409 (Pa. 2007) (citation omitted). Further, to constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party. Lock v. City of Phila., 895 A.2d 660 (Pa. Cmwlth. 2006). Evidentiary rulings which did not affect the decision will not provide a basis for disturbing the fact-finder's judgment. Merrell v. Chartiers Valley Sch. Dist., 51 A.3d 286 (Pa. Cmwlth. 2012).

With regard to videotape of Lytton's forensic interview of Child, the ALJ explained (with emphasis added):

> After [Child] was examined at the … hospital, she was scheduled for a forensic interview …. On September 15, 2011, [Child] was interviewed at [CAC] by [Lytton]. [Lytton] made an audio-video recording of the interview but <u>the recording was not requested of CAC by CYS and was not used as evidence in the hearing</u>. Generally, recordings of interviews are not provided by CAC absent a court order from the court of common pleas. <u>The recording was not in CYS possession, nor was it used as evidence by the agency in the expunction hearing</u>. [R.J.W.] objected to testimony by [Lytton] because it had not been provided with a copy of the recording of the interview. [R.J.W.] argued that it was prejudiced by the witness since it had no way for its expert to analyze the interview style. <u>The ALJ overruled the objection since the forensic interviewer was present and testifying about what [Child] had said and done in the interview. [R.J.W.] was permitted extensive cross-examination of the witness.</u> The ALJ overruled [R.J.W.'s] objection because after a child has testified at a hearing her hearsay may be admitted … once a child has been determined competent to testify and is either found unavailable or testifies at the expunction hearing. <u>[Child] was competent. She testified at the expunction hearing. I find that [Child's] hearsay statements to [Lytton] are admissible, as they would be if she made them to [Mother] or another person. [Child's] hearsay will be given little weight as it is only corroborative of [Child's] statements and demeanor as observed by others. It was not so much what [Child] said but what the child did that provided substantial evidence of the correctness of the CYS decision to register [R.J.W.].</u>

ALJ's Adj. at 15. Upon review, we reject R.J.W.'s assertions that a remand is appropriate here based on R.J.W.'s inability to view the videotape of the forensic interview.

More particularly, before the ALJ, R.J.W. objected to Lytton's testimony after learning Lytton videotaped her forensic interview of Child, but the videotape was not made available to R.J.W. N.T. at 429. The ALJ declined to exclude Lytton's testimony regarding her recollection of her forensic interview of Child based on the absence of the videotape. N.T. at 434-35. To that end, in response to R.J.W.'s objection, counsel for CYS explained: the videotape was never in CYS' possession, counsel for CYS did not view the videotape, and counsel for CYS did not intend to offer the videotape into evidence because, at that point, Child already testified live before the ALJ. N.T. at 434. Counsel for CYS further stated the videotape was in the possession of CAC, which, generally, will not release it without an order from a common pleas court. N.T. at 433, 436. Thus, the hearings here proceeded as if no videotape existed. N.T. at 432, 434-35.

Moreover, no abuse of discretion is apparent in the ALJ's decision to overrule R.J.W.'s objection to allowing Lytton to testify at the hearing on the ground that R.J.W. did not receive a copy of the videotape of Lytton's forensic interview of Child. To that end, Lytton explained she works as a Program Specialist Forensic Interviewer at A Voice for Me Child Advocacy Center. N.T. at 414. She attended a forensic interviewing training program, she participates in ongoing education in her field, and she began conducting forensic interviews in 2003. N.T. at 417-18. Lytton provided background on the manner in which she communicates with children and assesses their development and communication skills. N.T. at 420-27, 443-44. Additionally, at the hearing, the ALJ only permitted Lytton to testify regarding her recollection of the interview after she

refreshed her memory of the interview with her notes and report. N.T. at 435. Lytton then offered testimony regarding her interview of Child. N.T. at 445-57.

Nevertheless, R.J.W. argues his inability to use and view the videotape, "significantly impeded his ability to challenge the allegations made against him" in violation of his constitutional rights. Br. for Pet'r at 34. However, during the course of the hearings, R.J.W. elicited testimony from CYS witness Amy Russell, who serves Deputy Director of the National Child Protection Training Center, which the ALJ considered, regarding the suggestibility of young children. Specifically, Russell testified that the manner in which a forensic interviewer phrases questions can suggest responses from a child. N.T. at 321-22. Russell also testified that without a recording of the interview with Child it was difficult to assess the reliability of the information conveyed by Child during the interview. N.T. at 323. R.J.W. contends this testimony shows the videotape was necessary to assess the credibility of the forensic interview. It is clear from the ALJ's discussion, however, that the ALJ afforded little weight to the forensic interview in reaching his decision. ALJ's Adj. at 15.

To that end, in his findings the ALJ summarized Russell's testimony that the lack of a videotape of a forensic interview can make it difficult to assess the reliability of the information conveyed by a child during an interview, and that younger children may be more susceptible to suggestions made by the interviewer. F.F. Nos. 59-61. Despite this acknowledgement, the ALJ based his decision to uphold the indicated report of abuse on the live, credited testimony of Child, which was corroborated by the live testimony of Linda Chambers, Tamara Miller and

Mother. The ALJ gave little weight to Child's hearsay statements made during the forensic interview as those statements were merely corroborative of Child's statements and demeanor as observed by others. ALJ Adj. at 15. Thus, even if Lytton's testimony concerning Child's statements during the forensic interview were excluded based on R.J.W.'s inability to view the videotape of the forensic interview, the ALJ's decision to uphold the indicated report of abuse was adequately supported. As a result, the absence of the videotape simply does not provide a basis for a remand.

### C. Change from "Founded" to Indicated"
### 1. Contentions

As a final issue, R.J.W. asserts the ALJ impermissibly and without statutory authority permitted CYS to amend R.J.W.'s registration from "indicated" to "founded" and back to "indicated," and then decided the merits of the second indication based on evidence and testimony taken from the first registration of "indicated." He argues that, if CYS wished to file a new "indicated" report after it determined it lacked sufficient evidence to justify the change in R.J.W.'s registration status from "indicated" to "founded," it could do so, but the case would have to begin anew after that filing. Because the ALJ lacked authority to permit CYS to amend R.J.W.'s registration from "indicated" to "founded" and back to "indicated," R.J.W. contends reversal of the order denying his request for expunction is proper.

### 2. Analysis

"Our case law is unwavering that when a party fails to raise an issue, even one of a constitutional dimension, in an agency proceeding, the issue is

40

waived and cannot be considered for the first time in a judicial appeal." K.J. v. Dep't of Pub. Welfare, 767 A.2d 609, 612 (Pa. Cmwlth. 2001) (citation omitted). Further, failure to preserve an issue by raising an objection before an ALJ results in waiver. E.A.

Here, our review of the record reveals that, after its investigation, CYS filed an "indicated" report of abuse against R.J.W. in October 2011. R.R. at 2a-3a. R.J.W. sought to expunge the "indicated" report of abuse. R.R. at 1a. The ALJ held hearings on R.J.W.'s appeal of his "indicated" registration status in March, May and June 2012. Thereafter, in August 2013, R.J.W. pled *nolo contendere* to one count of endangering the welfare of a child. ALJ's Adj. at 13.

Shortly thereafter, CYS amended R.J.W.'s registration status from "indicated" to "founded" based on R.J.W.'s *nolo contendere* plea, and it filed a motion to dismiss R.J.W.'s appeal on the ground that a common pleas court accepted R.J.W.'s *nolo contendere* plea. Id. at 14. R.J.W. filed a response to CYS' motion to dismiss, asserting this *nolo contendere* plea was unrelated to the allegations of sexual abuse by CYS. Id. CYS notified the BHA it would amend R.J.W.'s registration status from "indicated" to "founded" based on the *nolo contendere* plea. Id. The Department amended R.J.W.'s registration status from "indicated" to "founded." Id. CYS notified R.J.W. of the change in his registration status. Id. The BHA scheduled a hearing for the purposes of determining whether R.J.W.'s registration status was correctly characterized as "founded." Id. R.J.W. appealed the amendment of his registration status from "indicated" to "founded." Id.

41

Thereafter, the ALJ held a hearing on the issue of whether R.J.W.'s registration status was correctly changed from "indicated" to "founded." Id. At the hearing, CYS ultimately conceded it lacked sufficient evidence to justify the change in R.J.W.'s registration status from "indicated" to "founded," N.T., 1/21/14, at 21-22, and it asserted the ALJ should decide the matter based on R.J.W.'s initial appeal of his "indicated" registration status. Id. at 27. The ALJ initially questioned whether he could decide this case based on R.J.W.'s appeal of his "indicated" registration status in light of CYS's amendment of R.J.W.'s registration status from "indicated" to "founded." Id. at 25-26. However, after further discussion, *by agreement of the parties*, the ALJ determined he would decide the case based on R.J.W.'s initial request for expunction of his "indicated" registration status on the record created by the parties at the three hearings in 2012. Id. at 41. Specifically, at the end of the January 2014 hearing, the following colloquy occurred:

> [CYS' Counsel]: Within 30 days, the agency will get to the [D]epartment a status asking to change the CY-49 [("founded" report)] to a CY-48 [("indicated" report)] and for this Court to decide the case on the merits. In the event that I have not already filed a brief, I will do so within that same 30 days, provide a copy to [R.J.W.'s] Counsel; and this Court will then decide it based on the merits of the three hearings already heard.
>
> THE COURT: That's assuming I have no objection that I can't -- to the contrary for [R.J.W.'s Counsel], too. He has to agree that I can work with the original hearings.
>
> [CYS' Counsel]: I thought he has.
>
> THE COURT: I thought he had, too, but I just want to make sure he has.

[R.J.W.'s Counsel]: <u>My client has indicated he's in agreement with that</u>. And, again, subject to my ability, if we have for whatever reason not filed a complete brief with a set of facts and law –

THE COURT: You may do so. Everyone has 30 days if it has not already been done. <u>However, if you do change your facts and law in some fashion, I am going to give the [D]epartment the additional seven days to reply</u>.

[R.J.W.'s Counsel]: <u>Understood. I don't intend to change them</u>.

THE COURT: Just in case. Anything further [CYS' Counsel]?

[CYS' Counsel]: No, Your Honor.

THE COURT: Anything further, [R.J.W.'s Counsel]?

[R.J.W.'s Counsel]: No, sir.

THE COURT: Hearing is adjourned. The record will close on submittal of the amendment.

Id. at 40-41.

In light of the fact that R.J.W. *agreed* to allow the ALJ to decide this matter on R.J.W.'s initial request for expunction of his "indicated" registration status based on the evidence presented over the course of three days of hearings, we reject as waived R.J.W.'s new, conflicting assertion that the ALJ erred in deciding this case based on the extensive record created on R.J.W.'s initial request for expunction of his "indicated" registration status.

### IV. Conclusion

For the above reasons, we discern no error in the BHA's determination that CYS established by substantial evidence the accuracy of its

43

indicated report of child sexual abuse against R.J.W.  Accordingly, we affirm the BHA's order denying R.J.W.'s appeal.


           _____
           ROBERT SIMPSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

R.J.W.,                                :
           Petitioner            :
                                  :   No. 836 C.D. 2015
          v.                    :
                                  :   SEALED CASE
Department of Human Services,          :
           Respondent            :

## O R D E R

**AND NOW**, this 17th day of May, 2016, the order of the Department of Human Services is **AFFIRMED**.

_____
ROBERT SIMPSON, Judge

+ IN THE COMMONWEALTH COURT OF PENNSYLVANIA

R.J.W.,                              :
                     Petitioner     :
                                     :
             v.                      :
                                     :  No. 836 C.D. 2015
Department of Human Services,        :  Submitted: February 12, 2016
                     Respondent :    SEALED CASE


BEFORE:    HONORABLE ROBERT SIMPSON, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE DAN PELLEGRINI, Senior Judge


DISSENTING OPINION BY
SENIOR JUDGE PELLEGRINI                FILED: May 17, 2016


          I respectfully dissent because the Administrative Law Judge's (ALJ)
opinion did not comply with due process or the Administrative Agency Law, 2 Pa.
C.S. §§501 – 508, 701 – 704, as it did not discuss or even mention the evidence
that R.J.W. proffered at the hearing in his defense. I also dissent because the ALJ
allowed the forensic interviewer to testify about what the Child told her in the
interview over the objections of R.J.W. to such testimony absent the videotaped
interview of the Child being produced.


                                    **I.**

          In this case, R.J.W. put on a full defense of the charges against him.
He testified on his own behalf, including that he and the Child's Mother were
going through a bitter custody dispute when the allegations of sexual abuse were
made, and that he believed the Child's Mother coached the Child on what to say.

Also, three other individuals testified as character witnesses and described the loving relationship the Child had with R.J.W. as well as their observations of the personal interactions between the Child and R.J.W. Finally, Dr. Bruce Chambers, Ph.D., a licensed psychologist, testified as an expert witness regarding forensic examinations. Dr. Chambers seriously doubted the veracity of the allegations given the known interview techniques used, as well as the inability for anyone, including him, to view the video recording of the forensic interview of the Child.

In a 16-page single-spaced opinion, with 69 findings of fact, the ALJ did not discuss or even mention any of the evidence that R.J.W. presented. The sole reference to the evidence that R.J.W. presented was found in finding of fact 67, where the ALJ found that "[R.J.W.] did not testify credibly." That is it. The majority finds that alone offers sufficient reasoning to comply with due process. I do not.

Included in both an individual's constitutional rights and procedural rights guaranteed by the Administrative Agency Law is the requirement that an agency explain its decision. An agency is already obligated by federal due process to state reasons for its decision. *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011 (1970). Because of the rise of federal due process jurisprudence, the procedural requirements set forth in the Administrative Agency Law are often overlooked, but those provisions also require that an agency must set forth the reasons behind its decision. Section 507 of the Administrative Agency Law, 2 Pa. C.S. §507, provides that:

All adjudications of a Commonwealth agency shall be in writing, shall contain findings and the reasons for the adjudication, and shall be served upon all parties or their counsel personally, or by mail.

When an agency arrives at a decision where the losing party has presented evidence that could require the agency to arrive at a different outcome, both due process and the Administrative Agency Law require the agency to, at the very least, show that it considered that evidence in arriving at its decision.

Moreover, in *G.V. v. Department of Public Welfare*, 91 A.3d 667 (Pa. 2014), the Supreme Court of Pennsylvania established that the proper evidentiary standard in child abuse expunction cases is the "legislatively established substantial evidence standard." *Id.* at 674. The Child Protective Services Law, 23 Pa. C.S. §§6301-6386, defines "substantial evidence" as "[e]vidence which *outweighs* inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion." 23 Pa. C.S. §6303(a) (emphasis added). As the majority admits, this statutory standard incorporates a "weighing dynamic" that goes beyond a traditional deferential substantial evidence review. *A.P. v. Department of Public Welfare*, 98 A.3d 736, 742-43 (Pa. Cmwlth. 2014). No "weighing dynamic" took place in this case.

Anyone who reads the ALJ's opinion would conclude that R.J.W. did not even put on a case. As mentioned previously, the opinion fails to discuss *any* of R.J.W.'s evidence or the contentiousness of the parties, and merely concludes that "[R.J.W.] did not testify credibly." This conclusory statement without any examination of R.J.W.'s evidence fails to constitute the required "weighing

dynamic." *A.P.*, 98 A.3d at 744 ("It is the factfinder's job to make and explain credibility determinations when conducting the 'weighing dynamic' required by 23 Pa. C.S. §6303(a).").

Both because the ALJ's adjudication does not satisfy due process and because the ALJ did not employ the required weighing dynamic, I would vacate and remand for consideration of the record in accordance with the required statutory weighing dynamic. *See A.P.*, 98 A.3d at 745 (stating that "dismissal of one side's evidence with a conclusory credibility determination does not suffice.").

**II.**

Equally troubling is the ALJ's decision to overrule R.J.W.'s objection regarding the lack of production of the Child's videotaped interview. Three days after the Child's Mother brought her to the emergency room, Jennifer Lytton (Lytton), a forensic interviewer for Washington County, conducted a forensic interview. Lytton made notes of her observations and of the Child's statements, and the interview was also audio-video recorded. During the hearings, counsel for R.J.W. objected to Lytton's testimony regarding the Child's forensic interview on the ground that he was not provided with a copy of the recording made of that forensic interview. R.J.W. argued that he was prejudiced by Lytton's testimony because there was no way for his expert to analyze Lytton's interview style.

The ALJ overruled the objection on the circular ground that Lytton was present and testified about the Child's statements and behavior during the forensic interview. The ALJ permitted R.J.W. to conduct extensive cross-

DRP - 4

examination of Lytton, and also noted that the Child herself also testified. These grounds do not support allowing Lytton to testify, given that the videotape is the best evidence of what the Child told her, which is confirmed by the testimony offered by the Washington County Office of Children and Youth Services (CYS).

CYS presented the testimony of Amy Russell (Russell), Deputy Director of the National Child Protection Training Center. Russell testified that a forensic interviewer has the power to suggest the desired responses through her body language or the way she phrases her questions. Citing the testimony of CYS' own expert, the ALJ found as fact the lack of a "video or audio recording of the . . . forensic interview . . . introduced as evidence makes it difficult to assess the reliability of the information conveyed at the interview by [Child]." F.F. No. 59. Again, citing Russell's testimony, the ALJ determined that the younger the child, the higher the risk of suggestibility, and younger children "may be led to claim that an event occurred when it was only a suggestion by the interviewer." F.F. Nos. 60-61. Lytton's testimony of what the Child told her should have been excluded because the videotape was the best evidence of what the Child actually told her and how that testimony was elicited.

Moreover, as the majority points out, the use of out-of-court statements by children in expungement cases is controlled by the Supreme Court of Pennsylvania's decision in *A.Y. v. Department of Public Welfare*, 641 A.2d 1148 (Pa. 1994). In *A.Y.*, the Court held that uncorroborated hearsay cannot satisfy the agency's burden unless it "was accurately recorded by audio or video equipment," and "the statement was not made in response to questioning calculated to lead the

minor to make a particular statement and was not the product of improper suggestion." *Id.* at 1153. Given the potential issues with forensic interviews of extremely young children – issues which were admitted by CYS' own expert as well as the ALJ – the testimony of Lytton should not have been allowed absent production of the videotaped interview. Because the videotape was not provided, on this basis, I would vacate the decision and remand for its introduction and evidence that goes to the forensic interview that Lytton conducted.

Accordingly, for the foregoing reasons, I respectfully dissent.

_____
DAN PELLEGRINI, Senior Judge