# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| J. L., | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 1363 C.D. 2023 |
| | : | SUBMITTED: December 9, 2024 |
| Department of Human Services, | : | |
| Respondent | : | **CASE SEALED** |

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE MATTHEW S. WOLF, Judge
HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

**OPINION NOT REPORTED**

**MEMORANDUM OPINION BY**
**SENIOR JUDGE LEADBETTER**                    **FILED:  January 9, 2025**

Petitioner, J.L., petitions for review of the order of the Department of Human Services, Bureau of Hearings and Appeals (Department), which adopted in its entirety the recommendation of the Administrative Law Judge (ALJ), denying Petitioner's appeal to expunge an indicated report of child abuse with the ChildLine and Abuse Registry.  For the following reasons, we affirm.

## Facts and Procedural History

Petitioner is the paternal cousin of the subject child, Z.V. (Child), a female born in 2002.[1]  Child and her brother, R.V. (Brother), went to live with Petitioner and his wife, K.L. (Wife), after their father died by suicide and their mother was unable to care for them.  Petitioner and Wife obtained legal custody of

---

[1] Unless otherwise stated, the facts are taken from the ALJ's findings of fact in the adjudication issued June 22, 2023.  *See* Certified Record (C.R.) at 93-113.

Child and Brother beginning in 2011, and Child lived with Petitioner and Wife at Wife's house from 2011 to 2021. Also living in the home were Petitioner's Stepson, L.P., and L.P.'s aunt (Aunt). During the time of the alleged incidents, Child was between the ages of 10 to 11 and Petitioner was aged 40 to 41.

In late 2017, the Department received a referral of suspected sexual abuse by Petitioner against Child (2017 referral). Notably, "[t]here was *no judicial adjudication or final judgment regarding the merits* of the 2017 referral." ALJ's Findings of Fact (F.F.) No. 13; Certified Record (C.R.) at 96 (emphasis added). Child recanted her allegations and, therefore, the Department sent a letter to Petitioner in January 2018 stating that ChildLine had marked the report against him as unfounded.[2]

In June 2022, Fayette County Children and Youth Services (CYS) received a referral again listing Petitioner as an alleged perpetrator of sexual abuse against Child (2022 referral). By this point Child was an adult, had moved out of Petitioner's home, and was living with her boyfriend and his mother. CYS conducted an investigation wherein "[C]hild revealed new evidence and allegations concerning [Petitioner]'s actions in the renewed report." F.F. No. 17; C.R. at 97. Child explained that she recanted her initial allegations because Petitioner told her that if she went through with them, "[Petitioner] would kill himself, and [Child]'s siblings would grow up without a dad." F.F. No. 19; C.R. at 96. In July 2022, CYS filed an indicated report of child abuse against Petitioner and subsequently notified him of this determination by letter. Petitioner filed an appeal in September 2022, opting to skip a review by the Department and proceed directly to a hearing.

---

[2] The term "unfounded report" is defined in the Child Protective Services Law (CPSL) as: "Any report made pursuant to this chapter unless the report is a 'founded report' or an 'indicated report.'" 23 Pa.C.S. § 6303.

Before the ALJ, Child testified to multiple instances of Petitioner touching her inappropriately, the first occurring at some point in 2013 when she was in fifth grade. Petitioner came into Child's bedroom late at night and got in bed with her, stating that it was more comfortable than his own bed. Petitioner began touching Child, mainly her breasts, over her clothing. This went on for several minutes until Child became upset and started crying. Child told Petitioner she "didn't want to do this" and it "didn't feel right." Feb. 1, 2023 Hearing, Notes of Testimony (N.T.) at 31; C.R. at 156. Petitioner eventually stopped and went back to his room.

The next instance Child described also occurred in 2013 when Petitioner picked her up from school in a white van. Petitioner directed Child to sit on his lap while he drove. Petitioner then put his hands up Child's shirt and groped her breasts while they drove to the post office. Child was able to provide specific details about the episode such as the weather, a description of the van, and the reason Petitioner had for visiting the post office. Child also described an occurrence where Petitioner took her to a bar he owned to meet up with some of his friends. After the friends left, Petitioner took Child upstairs, laid her down on a pool table, lifted her shirt up and touched her breasts under her shirt. Again, Child was able to provide details surrounding the incident.

The final specific episode Child testified to[3] happened when she was approximately 12 to 13 years old, just after she started shaving. Petitioner stripped all her clothes off and had her lay on her back at the end of the bed with her legs apart. Petitioner went "over every single one of [her] razor bumps like on [her]

_____

[3] Child also relayed that Petitioner often would call her into his room and would touch her or have her get in bed with him. Many times this happened when no one else was home. *See* N.T. at 36-37; C.R. at 161-62. Child also stated that there was emotional and physical abuse occurring. N.T. at 43; C.R. at 168. The ALJ did not make any specific findings regarding these generalized allegations, but did determine that Child testified credibly. F.F. No. 63; C.R. at 100.

vaginal area with rubbing alcohol and a Q-tip just so he could look at [her]." N.T. at 38; C.R. at 163. Petitioner got an erection while doing this.

Child testified that around the time she was 15, she had her friend, M.P. (Friend), draft a note detailing the abuse that Child suffered at the hands of Petitioner. Friend's mom found the note and alerted CYS, which is how the 2017 referral came to be. When asked why she initially told CYS the allegations in the 2017 referral were untrue, Child explained,

> when this all came out, [Petitioner] sat me down and he had a serious talk with me about this stuff. In which this [sic] talk he apologized to me and he—it was the first time he admitted to me that he did this stuff to me. Although he said he was sorry he told me if I was to go through with this and I was to tell the truth about all of this that he would kill himself and [Child's siblings] would grow up without a dad and it would be my fault.

N.T. at 40; C.R. at 165. Child further explained that she came forward with the allegations in the 2022 referral because she was no longer living with Petitioner, no longer felt pressured by him, was not living in fear, and felt that if she would speak out she would not "be hurt or shamed." N.T. at 45; C.R. at 170. Child wanted people to be aware of what happened because Petitioner "was still around children." N.T. at 44; C.R. at 169.

On cross examination, Child admitted that at the time she moved out, she was having a disagreement with Petitioner and Wife about her college plans. Petitioner and Wife wanted to pay for Child to attend California University of Pennsylvania (Cal-U), but Child wanted to go to Penn State. While Child admitted that her boyfriend at the time was also going to Penn State, she just wanted to go to a school where she would be away from her family. Child confirmed that she

worked at a retail store in a nearby shopping outlet. Child denied seeing Aunt at the outlet in December 2022, noting that she had not seen Aunt "for a long time." N.T. at 65; C.R. at 190.

Rachel Fremd, a caseworker with CYS, testified that she was assigned to investigate the 2022 referral. Fremd made a referral to the Pennsylvania State Police's (PSP) Belle Vernon barracks because the case involved alleged sexual abuse occurring within that jurisdiction.[4] Fremd and PSP Trooper Kara interviewed Child in June 2022 wherein Child relayed "the sexual abuse that [Petitioner] inflicted upon her." F.F. No. 41; C.R. at 99. Fremd confirmed that Child's testimony during the hearing was consistent with her statements throughout the CYS investigation.

Fremd and PSP Trooper Kara then met with Petitioner, Wife, and their lawyer in July 2022, at which time Petitioner denied the allegations. Petitioner stated that he does not drive white work vans and that if he ever picked Child up from school there was someone else in the car with them. N.T. at 100-01; C.R. at 225-26. He further explained that when Child was cutting herself, he was not the one to "inspect" her; rather, Wife "would make [Child] wear a bikini and a robe and then would make [Child] take the robe off when checking to see where [Child] had cut herself[.]" N.T. at 102; C.R. at 227. Fremd testified that

> at the end of our interview when we were all getting ready to leave, [Wife] had stated that they had felt like they failed as parents because they couldn't fix [Child] and her brother. And [Child] and her brother were called mistakes and they were compared to broken dogs that could not be house trained anymore.

N.T. at 102-03; C.R. at 227-28.

---

[4] Fremd further explained that she reached out to Washington County CYS and asked that agency to ensure Child's safety because Child was living in Washington County at the time.

On cross examination, Fremd admitted that she was given approval to classify the 2022 referral as indicated based solely on Child's "credible statements and disclosures[.]" N.T. at 124; C.R. at 249. As for the 2017 referral, Fremd did not work for CYS at that time and the records have been expunged. Fremd did talk to Child about it and Child explained that she recanted due to Petitioner's threat of killing himself. *Id.*

Aunt testified that on December 15, 2022, she went to the outlet where Child worked to do Christmas shopping. Aunt did not go into the specific store where Child worked, but saw Child walk out of the store on her break. Aunt claimed that Child told "her that she was 'tired of being [Petitioner]'s slave' and that [Child] was going to 'make [Petitioner] pay' for what he did to her by making up stories about him." C.R. at 112 (quoting N.T. at 148-49).[5]

Wife testified that she and Petitioner agreed to pay for Child's education if she attended Cal-U because it had a better teaching program than Penn State. Wife believed that Child wanted to attend Penn State not for the academics, but so she could be with her boyfriend. She did not recall characterizing Child and Brother as broken dogs that needed to be fixed.

Tragically, Wife's eleven-year-old niece was assaulted and eventually murdered, so she is "a little bit sensitive to child abuse of any kind." N.T. at 201; C.R. at 326. If she believed "any child was being abused in anyway," even by her husband, she "would be the first to report and remove" them from the situation. *Id.* Wife denied the allegations and did not believe Petitioner would ever touch a child inappropriately. She did, however, confirm that the business she owned with Petitioner had a fleet of vehicles, including a white van that Petitioner purchased and

---

[5] Petitioner's son and daughter-in-law also testified.

6

had access to during the relevant time. N.T. at 210-11; C.R. at 335-36. When they met with Fremd and PSP Trooper Kara in July 2022, Petitioner also confirmed that he had access to and may have driven a white van, but never brought it home. N.T. at 218; C.R. at 343.

Finally, Petitioner testified, denying each of the specific allegations of abuse and denying that he pressured or coerced Child into recanting. However, he admittedly spoke to Child after the initial 2017 referral surfaced and before he took the family to meet with CYS. Petitioner stated that he was never alone with Child in a white van, or any other van for that matter. Wife did "inspect" Child to see if she was cutting herself, but Petitioner denied ever doing so. Wife enrolled and took Child to counseling, but after a few sessions they told Wife that Child did not need to come back. Petitioner did not recall telling Trooper Kara and Fremd that counseling for Child "would be a waste of [his] money." N.T. at 263; C.R. at 388. While Petitioner did not remember Wife characterizing Child as a broken dog, he did testify: "[Child] was broken when we got her." N.T. at 245; C.R. at 370.

Petitioner admitted to pleading guilty to the charge of conspiracy to commit burglary in 1992. The ALJ admitted into evidence, over Petitioner's objection, the corresponding criminal docket sheet for the purpose of impeachment and indicated that the parties could brief the issue.

In June 2023, the ALJ issued an adjudication recommending that Petitioner's appeal be denied. The ALJ found that Child, Fremd, and Wife testified credibly, and that Petitioner and Aunt did not testify credibly. F.F. Nos. 63-69; C.R. at 100. In explaining these credibility determinations, the ALJ stated: "[C]hild was consistent, and precise in her testimony, and appeared truthful. She described the alleged incidents . . . in exacting detail and with frankness. [Petitioner], by contrast,

7

presented as brash, dismissive, and untrustworthy." C.R. at 112. The ALJ also held that "[C]hild's previous recantation of allegations against [Petitioner] does not lessen her credibility here." *Id.* He stressed that the context of Child's recantation was important, noting Petitioner's threat to take his own life if Child followed through with her allegations. Further, the ALJ determined that the purported conversation between Child and Aunt at the Tanger outlets did not happen and therefore rejected the argument that Child's allegations against Petitioner were retaliatory.

Using the version of the Child Protective Services Law (CPSL) applicable at the time of the incidents,[6] the ALJ determined that CYS proved by substantial evidence that Petitioner committed child abuse. More specifically, the ALJ found that CYS met its burden with respect to sexual abuse or exploitation, but failed to meet its burden with respect to sexual assault. The ALJ also rejected Petitioner's argument that the 2022 referral was barred under the doctrines of *res judicata* and collateral estoppel because there was not a final judgment on the merits with respect to the 2017 referral.

---

[6] The definitions of the terms "child abuse" and "sexual abuse or exploitation" set forth in Section 6303 of the CPSL were amended by the Act of December 18, 2013, P.L. 1170, which became effective December 31, 2014. At the time the conduct at issue here occurred, the CPSL defined the term "child abuse" as, among other things, "[a]n act or failure to act by a perpetrator which causes nonaccidental serious mental injury to or sexual abuse or sexual exploitation of a child under 18 years of age." 23 Pa.C.S. § 6303(b). In turn, the relevant version of the CPSL defined "sexual abuse or exploitation" to include, among other things, sexual assault or "[t]he employment, use, persuasion, inducement, enticement or coercion of a child to engage in or assist another individual to engage in sexually explicit conduct, which includes . . . [l]ooking at the sexual or other intimate parts of a child or another individual for the purpose of arousing or gratifying sexual desire in any individual." 23 Pa.C.S. § 6303(a).

On October 26, 2023, the Bureau issued an order adopting the ALJ's recommendation in its entirety without further explanation. C.R. at 92. Petitioner then filed his petition for review to this Court and CYS intervened.[7]

**Issues**

Petitioner raises the following issues on appeal, which we have rephrased to aid in disposition: whether the current proceedings regarding the 2022 referral are barred by the principles of *res judicata* and collateral estoppel; whether the current proceedings violate Petitioner's due process rights and double jeopardy; whether the ALJ's credibility determinations are supported by substantial evidence or are biased; and whether the ALJ erred by admitting into evidence and considering his decades-old burglary conviction.

**Discussion**

Petitioner first argues that the evidence presented at the hearing before the ALJ establishes that Child's allegations of abuse in the 2022 referral are the same allegations that were raised in the 2017 referral, which were determined to be unfounded. Given the final decision issued with respect to the 2017 referral and the same factual basis underlying the claims, the current proceedings regarding the 2022 referral are barred by the doctrines of *res judicata* and collateral estoppel. Petitioner similarly claims that CYS's investigation of the 2022 referral constitutes a violation of his due process rights and a violation of double jeopardy because the agency is relitigating the same claims of abuse many years after the initial report was made. We disagree.

As this Court has explained,

_____

[7] The Department chose not to file a separate brief in this matter, noting that the issues have been adequately addressed by CYS. *See* Dep't's Ltr. filed June 27, 2024.

9

> [*r*]*es judicata* encompasses two related, but distinct principles: technical *res judicata* and collateral estoppel. *Stilp v. Commonwealth*, 910 A.2d 775 (Pa. Cmwlth. 2006). Technical *res judicata* provides, *where a final judgment on the merits exists*, a future lawsuit on the same cause of action is precluded. *Id.* Collateral estoppel acts to foreclose litigation in a subsequent action where issues of law or fact were litigated and necessary to a previous judgment. *Id.*

> [C]ollateral estoppel bars a subsequent lawsuit where (1) an issue decided in a prior action is identical to one presented in a later action; (2) *the prior action resulted in a final judgment on the merits*; (3) the party against whom collateral estoppel is asserted was a party to the prior action, or is in privity with a party to the prior action; and (4) the party against whom collateral estoppel is asserted had *a full and fair opportunity to litigate the issue in the prior action*. *Unified Sportsmen of Pa. v. Pa. Game Comm'n*, 950 A.2d 1120 (Pa. Cmwlth. 2008).

*C.J. v. Dep't of Pub. Welfare*, 960 A.2d 494, 499 (Pa. Cmwlth. 2008) (emphasis added).

Notwithstanding Petitioner's assertions, the 2017 referral of child abuse was not previously litigated and did not result in a final judgment on the merits. The testimony of Fremd, Child, and even Petitioner himself establish that Child recanted her allegations shortly after the 2017 referral was made to CYS. No hearing took place, meaning there was not "a full and fair opportunity to litigate" the abuse allegations, and a final order was not issued by the Department. *Id.* CYS's designation of the 2017 referral as unfounded is a term of art specific to the context of child abuse allegations, *see supra* note 2, and is not tantamount to a final decision on the merits. Further, since CYS's file regarding the 2017 referral was expunged after the matter was deemed unfounded, there is no way to know that the underlying abuse allegations are identical. Because several of the above requirements are not

10

present, neither *res judicata* (claim preclusion) nor collateral estoppel (issue preclusion) applies here. *See Westmoreland Cnty. Child.'s Bureau v. Dep't of Pub. Welfare* (Pa. Cmwlth., No. 429 C.D. 2009, filed Nov. 17, 2009) (finding *res judicata* and collateral estoppel did not apply "as there was no decision on the merits in the first proceeding, but only a procedural default").[8]

As for Petitioner's double jeopardy[9] and due process arguments, CYS maintains that these issues are waived because they were not raised below. It is well established that an issue is waived if not properly raised and preserved at the agency level and cannot be considered for the first time on appeal. *K.J. v. Pa. Dep't of Pub. Welfare*, 767 A.2d 609, 612 (Pa. Cmwlth. 2001). Petitioner's brief submitted to the ALJ makes only passing reference to these arguments, and neither is supported with pertinent authority. Petitioner's brief to this Court similarly fails to present any case law to support the applicability of double jeopardy protections to what he refers to as "quasi-criminal" child abuse expunction proceedings. Pet'r's Br. at 19. Regardless, Petitioner's double jeopardy argument must fail because there was no proceeding or determination regarding the 2017 referral wherein jeopardy could have attached. It is also undisputed that Petitioner received adequate notice of both the allegations and the hearing, and that he was afforded an opportunity to be heard and to defend himself before the ALJ. Therefore, Petitioner's due process argument also lacks merit.

---

[8] This unreported opinion is cited for its persuasive value only and not as binding precedent. *See* Pa.R.A.P. 126(b); 210 Pa. Code § 69.414(a).

[9] Section 10 of article I of the Pennsylvania Constitution provides: "[n]o person shall, for the same offense, be twice put in jeopardy of life or limb[.]" Pa. Const. art. I, § 10. The Fifth Amendment to the United States Constitution provides, in pertinent part, that no person shall be "subject for the same offence to be twice put in jeopardy of life or limb[.]" U.S. Const. amend. V.

11

Next, Petitioner claims generally that the ALJ's findings and conclusions are not supported by substantial evidence. Petitioner specifically takes issue with the ALJ's credibility determinations, arguing that they reveal a predisposition to credit the testimony of Child on every relevant fact, while ignoring or dismissing the testimony of Petitioner and his witnesses. Again, we disagree.

It is axiomatic that the Department "is the ultimate fact[]finder in expunction appeals" and responsible for credibility determinations. *F.V.C. v. Dep't of Pub. Welfare*, 987 A.2d 223, 228 (Pa. Cmwlth. 2010). "Absent an abuse of discretion, we will not disturb the [Department]'s determinations as to credibility and evidentiary weight." *R.J.W. v. Dep't of Hum. Servs.*, 139 A.3d 270, 285 (Pa. Cmwlth. 2016) (citing *F.V.C.*).

Here, Petitioner does not challenge specific findings of fact other than those pertaining to credibility. Both Child and Petitioner testified in person before the ALJ; therefore, he was able to assess their demeanor first-hand. In explaining why he determined that Child testified credibly and Petitioner did not, the ALJ stressed that Child's testimony was clear, precise, and in-depth, noting that she was able to provide significant detail surrounding the events. Child's statements remained consistent despite intense cross-examination and were in harmony with the allegations she reported to Fremd throughout CYS's investigation. The ALJ explained that Petitioner, "by contrast, presented as brash, dismissive, and untrustworthy. He gave a blanket denial of [Child]'s account of the events in question, brushing off the serious allegations against him as unreliable because" of Child's previous recantation. C.R. at 112. The ALJ also adequately addressed and weighed the fact that Child recanted after the allegations were initially reported by Friend's mom. Given all of this, we discern no abuse of discretion and will not

12

disturb the credibility determinations on appeal. Moreover, this Court has repeatedly held that "the testimony of the victim alone constitutes substantial evidence to support an indicated report of child abuse." *D.T. v. Dep't of Pub. Welfare*, 873 A.2d 850, 854 (Pa. Cmwlth. 2005) [citing *G.S. v. Dep't of Pub. Welfare*, 521 A.2d 87 (Pa. Cmwlth. 1987)]; *see also R.J.W.*, 139 A.3d at 285; *K.J.*, 767 A.2d at 612. Thus, we reject Petitioner's substantial evidence argument.

Finally, Petitioner argues that the ALJ erred by admitting into evidence and considering his burglary conviction, which occurred decades prior. As CYS notes in its brief to this Court, however, the ALJ's recommendation does not assign any weight to this evidence, nor is the conviction mentioned in the lengthy discussion pertaining to Petitioner's credibility. Because the conviction did not factor into the ALJ's determination, Petitioner's argument is without merit.

Accordingly, the order of the Department is affirmed.

_____
**BONNIE BRIGANCE LEADBETTER**
President Judge Emerita

13

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

J. L.,                                          :
                            Petitioner         :
                                               :
            v.                                 :      No. 1363 C.D. 2023
                                               :
Department of Human Services,                  :
                            Respondent         :      **CASE SEALED**

## O R D E R

AND NOW, this 9th day of January, 2025, the order of the Department of Human Services in the above-captioned matter is hereby AFFIRMED.

_____
**BONNIE BRIGANCE LEADBETTER**
President Judge Emerita