# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| H.W., | : | ***CASES SEALED*** |
| Petitioner | : | ***CASES CONSOLIDATED*** |
| | : | |
| v. | : | Nos. 275 & 276 C.D. 2024 |
| | : | |
| Department of Human Services, | : | Submitted: June 3, 2025 |
| Respondent | : | |

BEFORE:  HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE MICHAEL H. WOJCIK, Judge
HONORABLE LORI A. DUMAS, Judge

## ***OPINION NOT REPORTED***

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                                    FILED: July 15, 2025

In this sealed child abuse expunction case, H.W. (Mother) petitions for review of the February 12, 2024 adjudication of the Department of Human Services, (Department) Bureau of Hearings and Appeals (BHA), which denied Mother's appeal from an indicated report identifying her as a perpetrator of child abuse as defined by the Child Protective Services Law (CPSL), 23 Pa.C.S. §§ 6301-6386.  The report identified Mother's then 11-month-old daughter, M.W. (Child), as the victim of the abuse.  The BHA adopted in its entirety a recommendation by the administrative law judge (ALJ) to deny Mother's appeal on the basis that the Bucks County Children and Youth Services (CYS) successfully met its burden of producing substantial evidence of Mother's physical abuse of Child.  For the following reasons, we affirm.

## I.    Facts and Procedural History

Mother is the biological mother of J.F., a 16-year-old male, C.M., an 11-year-old male, T.M., a 9-year-old male, and Child.

Prior to the June 2019 incident that gave rise to the instant appeal, Child was subjected to child abuse in February 2019, at the hands of her biological father, J.W. (Father), who was criminally charged with violently shaking the Child. Child was hospitalized for shaken baby syndrome and seizures. Pursuant to a no-contact order, Father was not allowed to be in the marital home or around any child under the age of 16.

On Saturday, June 15, 2019, Shawn Rush, the on-call case worker for CYS, received a report of suspected child abuse involving Child who was at Lehigh Valley Children's Hospital. X-rays performed on Child's right leg revealed a "classic metaphyseal lesion of the right medial proximal tibial metaphysis" and a "classic metaphyseal lesion of the posterior distal femoral metaphysis." (Certified Record (C.R.) at 53, 64, 204-05.) In layman's terms, there were two fractures of the right leg, one of the tibia and one of the femur.

At the hospital, Mr. Rush spoke to Mother who informed him that Child's right leg was caught between two crib slats. She said that morning at 8:30 a.m., she put Child down for her morning nap. Mother was gone for about five minutes but returned when she heard Child screaming. Mother observed Child's right foot wedged between the vertical slats of the crib. Mother had to lift and twist Child's right leg to release her foot. At the time of the incident, Child was alone in her room. Mother also volunteered to Mr. Rush that her son, C.M., who is autistic, often "messes with" Child. Child was admitted to the hospital.

On June 16, 2019, Dr. Ruchita Doshi, a pediatric hospitalist and pediatrician at Lehigh Valley Health Network, interviewed Mother. Mother reiterated that Child's right leg was stuck in the crib's slats and that she twisted Child's leg to free it. Mother was concerned that she may have injured her leg when she took Child out of the crib and then brought her to the emergency room. Mother then spontaneously stated that Father was in the home on Thursday, June 13, 2019, despite his prior criminal charges months earlier for suspected child abuse, that he saw the kids, and that he stayed over Thursday night. Mother told Dr. Doshi that she was asked in February 2019 to seek a Protection from Abuse (PFA) order, but she did not do so because Father threatened her. *Id.* at 42.

After her interview with Mother, Dr. Doshi ordered a full skeletal survey of Child, which revealed a third fracture, described as a "classic metaphyseal lesion of the **left** medial proximal tibial metaphysis." *Id.* at 47 (emphasis added). Dr. Doshi found Child's bilateral leg fractures to be highly suspicious of "non-accidental trauma." *Id.* Dr. Doshi also determined that Child's bilateral fractures were not consistent with the mechanism of the injury as described by Mother because Mother's account of finding Child's right leg wedged between the crib slats did not explain the fractures in both legs. *Id.* at 49. Medical staff at Lehigh Valley Health Network determined that the fractures to the tibia bone in both legs and the right femur fracture all occurred within 72 hours of Child's arrival at the hospital. *Id.* at 64. Medical testing also confirmed that Child did not have any underlying medical or genetic conditions, such as osteopenia, bone disease, vitamin D deficiencies, or other bone-related conditions, making her more likely to break a bone.

On June 17, 2019, Child and her siblings were taken into protective custody of CYS and placed into foster care. Sarah Santin was the CYS caseworker assigned to investigate the case.

During a telephone call with Ms. Santin on June 18, 2019, Mother said that Child's maternal grandmother and maternal aunt took Child to the shore on June 7, 2019. Mother proposed that Child may have injured herself at the shore while they were teaching Child to crawl. She also posited that something may have happened at Child's daycare. *Id.* at 71. Ms. Santin conducted interviews and investigated both possibilities.

On June 20, 2019, Mother texted Mr. Rush that "[Father] did it. He hurt me too . . . I have a head injury." *Id.* at 93.

On June 25, 2019, Mother telephoned Ms. Santin and admitted that on Wednesday, June 12, 2019, she picked up Father at the tire store and brought him back to the house. The children were at daycare. She said that around 7:40 p.m., she dropped Father off at the tire store and picked up her children from daycare around 8:00 p.m. As she was putting her sons to bed on the third floor, she heard the door sensor go off, and when she got to Child's room, she saw Father holding Child. She confronted Father and grabbed Child by her upper body while Father pulled Child by her legs. *Id.* at 99-100.

On April 14, 2020, CYS filed an indicated report of child abuse against Mother and Father. On April 22, 2020, CYS informed Mother that her name would be listed as a perpetrator on the indicated report of child abuse. On May 30, 2020, ChildLine, through counsel, received Mother's appeals, requesting her name be expunged from the ChildLine Registry.

Administrative hearings were held before the ALJ on July 25, 2022, and June 1, 2023. Mother testified on her own behalf. CYS presented the testimony of Mr. Rush, Dr. Doshi, Father, and Ms. Santin.

Mr. Rush testified regarding his meeting with Mother at the hospital, and her various accounts of how Child's right leg may have been injured. (July 25, 2022 Hearing Transcript, Reproduced Record (R.R.) at 58a-65a.) He explained that after talking to Mother, CYS implemented a safety plan whereby Mother's contact with the children was to be supervised until further assessments could be made. *Id.* at 64a. Mr. Rush said that he was not the investigative worker that took over the matter, but he was, after the children were placed into foster care, assigned as the foster care worker, and that he remained in that position for about two years. *Id.* at 65a. His duties included overseeing the children's placement and working with the parents on day-to-day happenings and on a plan of reunification. *Id.* Mr. Rush explained how he coordinated a group text which included himself, Mother, and Child's maternal grandmother, and that Mother texted on the group message on June 20, 2019, that it was Father who caused Child's injuries.

During cross-examination, Mother's counsel attempted to question Mr. Rush about his continued interest in the case after his role as the foster care worker had ended in order to establish "bias." *Id.* at 73a-74a. The ALJ sustained an objection to the line of questioning. *Id.* at 74a.

Dr. Doshi testified about her examination of Child, Child's prior medical history, and the results of Child's blood tests, MRIs and skeletal surveys. She also recounted her conversations with Mother, including Mother's confession that Father was in the house two days earlier, on Thursday. *Id.* at 83a. Dr. Doshi was qualified as an expert in child abuse and child protective services medicine. She opined that Child's

5

injuries were "non-accidental." *Id.* at 87a-91a. When asked if Child's injuries were consistent with the history Mother provided, Dr. Doshi provided the following explanation of why they were not.

> [T]he history that [Mother] provided that after – shortly after placing [Child] in her crib for a morning nap, she then heard her screaming and came back and saw that her right leg was stuck in between the crib slats. Okay. So, if a child's leg is stuck in between a crib's slats it could mean that the crib, first of all is not per standard of American Academy of Pediatric recommendations, which is crib slats to be no more than – I'm sorry should be no less than two and three-eighths inches. This is because a crib slat, the slats have to be a specific width in order to prevent any child's head or extremities to become stuck. If, let's say, this crib was not up to standards and even if her right leg was stuck in between the crib slats, the most common mechanism you would have seen would have been a twisting motion by the child's own weight and force. As she was reportedly left alone in the room and the only way that she could have fractured her own leg was that she twisted it while trying to remove her leg from the crib slats. Okay. So, if her right leg was stuck in between the crib slats and it was a twisting mechanism the most common type of fracture we would see would be a spiral fracture along a single bone that – where the leg was stuck. In no part of the history did [Mother] offer that both legs were stuck and furthermore, there was no spiral fracture that was seen on any of the x-rays, and it was a classic metaphyseal lesion. The method for a classic metaphyseal lesion involves a sudden extremity pull or twisting with significant force. So, this would have to be a pull with a force, not just a twist by the child's own force.
>
> Furthermore, having bilateral fractures with classic metaphyseal lesions is more concerning that the child may have been shaken as this involves extreme rapid acceleration and decelerations with the legs flailing back and forth, and

this is the more common mechanism of when seen bilateral classic metaphyseal lesions.

*Id.* at 93a-94a.

Dr. Doshi further confirmed that "[Child] had [a] skeletal survey[] . . . in February with a repeat. Both of the skeletal surveys show no bony abnormalities, no underlying bone conditions such as osteopenia or decreased bone demineralization." *Id.* at 108a. So, it was not possible that Child sustained the fractures as the result of Father's abuse in February. Rather, they "occurred between zero and 72 hours of the [June 15, 2019] skeletal survey being obtained." *Id.* at 105a.

Father also testified that he was living at his father's house on Thursday, June 13, 2019. On that day, he received a text message from Mother asking him to come to the house because she had a fever and needed help with the children. *Id.* at 119a. She met him at the tire store, and they drove to the house around 4:30 p.m. Later that night, she picked the children up from daycare. She told Father to go to their bedroom and lock the door so that the children could not come in and see him there. *Id.* at 120a-21a. After she put the children to bed, Mother and Father also went to sleep. He left at 5:30-6:00 a.m. because he had to be at work by 6:30 a.m. He testified that he did not have any contact with the children that night. *Id.*

Ms. Santin testified that she learned from Dr. Doshi that Child's injuries were "non-accidental fractures caused by extreme shaking or force – extreme force." (June 24, 2022 Hearing Transcript, R.R. at 152a.) She investigated each of Mother's theories as to how Child could have been injured and discredited all of them. *Id.* at 153-54a. She stated that on June 25, 2019, Mother telephoned her and admitted that Father was in the home on Thursday and that she and Father had pulled Child between them during an altercation. *Id.* at 155a. At that point, the children were placed with their maternal grandmother, and CYS issued an indicated report naming Mother as a

7

perpetrator of child abuse for creating a reasonable likelihood of bodily injury. *Id.* at 160a.

Mother testified that Father was asked to leave the marital home based on a no-contact order in connection with the February 2019 incident. *Id.* at 177a. Mother admitted to allowing Father back in the house, but denied she allowed him to be present when the children were home. *Id.* at 178a. After putting her other two children to bed, Mother went into Child's room and observed Father holding Child. *Id.* at 179a-81a. She admitted to grabbing Child by the upper torso, while Father grabbed the lower body and "yanked" her legs. *Id.* at 181a. Mother also admitted that she did not disclose that incident upon arrival at the hospital. *Id.* at 185a.

On February 8, 2024, the ALJ issued her Adjudication and Recommendation that Mother's appeal be denied. The ALJ found Mr. Rush, Ms. Santin, and Dr. Doshi credible, while Father was found mostly credible. (Adjudication and Recommendation dated June 14, 2023 (Adjudication), at 10-11; Finding of Fact (F.F.) 63-66; C.R. at 141-42.) Mother was deemed not credible. *Id.* at 11; F.F. 67; C.R. at 142. The ALJ determined that Mother had presented five different stories regarding the causation of Child's leg fractures, none of which were plausible explanations for Child's injuries. *Id.* at 16, 18; C.R. at 147, 149. Further, Mother admitted to allowing Father into the home despite the no-contact order, as well as her story that she grabbed Child's torso while Father grabbed Child's legs. *Id.* at 17; C.R. at 147-48. The ALJ, relying on the credible testimony of Dr. Doshi, concluded that the various stories provided by Mother were not consistent with the mechanism of injury sustained by Child. *Id.* at 17; C.R. at 148. Finally, the ALJ found that Child's injuries occurred within 72 hours of presenting at the hospital and Child did not have any

8

underlying medical or genetic conditions, bone disease, deficiencies or conditions making her prone to fractures. *Id.*

Following her conclusion that Child suffered non-accidental injuries that were also not self-inflicted, the ALJ determined the *prima facie* presumption under Section 6381(d) of the CPSL, 23 Pa.C.S. § 6381(d),[1] applied. *Id.* at 14; C.R. at 145. Citing *In the Interest of L.Z., a Minor Child. Appeal of L.Z.*, 111 A.3d 1164 (Pa. 2015), the ALJ noted that Mother was the caretaker of Child during the applicable time frame in which the abuse occurred, and concluded that Mother, who was the sole caregiver during the 72-hour period prior to June 15, 2019, failed to rebut the presumption that she committed the abuse upon Child. *Id.* at 18; C.R. at 149.

On February 12, 2024, BHA issued a Final Order adopting the recommendation of the ALJ that the appeal be denied. Mother now petitions for review.

## II.    Issues[2]

Mother argues that the findings of abuse were legally insufficient because (1) no evidence was presented that she injured Child, and the only reasonable

---

[1] This Section provides:

> **Evidence in court proceedings: Prima facie evidence of abuse.**
> Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be prima facie evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa.C.S. § 6381(d).

[2] This Court's review determines whether legal errors have been committed, whether constitutional rights have been violated, or whether the necessary findings of fact are supported by substantial evidence. *T.H. v. Department of Human Services*, 145 A.3d 1191, 1196 n.6 (Pa. Cmwlth. 2016) (quoting *F.R. v. Department of Public Welfare*, 4 A.3d 779, 782 n.7 (Pa. Cmwlth. 2010)).

conclusion from the evidence presented was that Father was the one who injured Child; (2) the uncontroverted testimony established that Mother did not permit Father access to Child; therefore, the finding of abuse by omission was unsupported; (3) the Department's finding of abuse by omission for delay in taking Child for medical treatment was not supported. Mother also argues that the ALJ erred and abused its discretion by not allowing her attorney to interrogate Mr. Rush regarding his bias against her.

### III. Analysis

The county agency bears the burden of proving in an expungement case that the actions of the perpetrator constitute child abuse within the meaning of the CPSL. The county's evidence must outweigh any contrary evidence. *B.J.K. v. Department of Public Welfare*, 773 A.2d 1271, 1276 (Pa. Cmwlth. 2001).

"In child abuse expunction proceedings, [BHA], as the [Department] Secretary's designee, is the ultimate finder of fact, and the ultimate arbiter of the weight to be assigned to the evidence presented." *Beaver County Children & Youth Services v. Department of Public Welfare*, 68 A.3d 44, 47 n.4 (Pa. Cmwlth. 2013); *F.V.C. v. Department of Public Welfare*, 987 A.2d 223, 228 (Pa. Cmwlth. 2010). "When the fact finder has determined the weight and credibility of evidence, [this Court] will not disturb such determinations on review." *Id.* However, whether a county agency's evidence satisfied the evidentiary standard set forth in the statute is a question of law. *In re S.H.*, 96 A.3d 448, 455 (Pa. Cmwlth. 2014).

The proper inquiry into whether an indicated report of child abuse should be expunged or maintained is whether the report is accurate. *D.T. v. Department of Public Welfare*, 873 A.2d 850, 853 (Pa. Cmwlth. 2005). Section 6341(a)(2) of the CPSL authorizes "[the Department's S]ecretary to . . . expunge an indicated report on

the grounds that it is inaccurate or it is being maintained in a manner inconsistent with [the CPSL]." 23 Pa.C.S. § 6341(a)(2). This Court has explained:

> "[T]he proper inquiry into whether an indicated report of child abuse should be expunged is whether the report is accurate." *B.K. v.* [*Department of Public Welfare*], 36 A.3d 649, 653 (Pa. Cmwlth. 2012). CYS bears the burden of showing that the indicated report of abuse is accurate and is consistent with the Law. *T.H. v.* [*Department of Human Services*], 145 A.3d 1191, 1198 (Pa. Cmwlth. 2016); 23 Pa.C.S. § 6341(c).
>
> An indicated report is issued by a county agency or [the Department] if, after an investigation, "'substantial evidence' of the alleged abuse exists based on available medical evidence, the child protective service investigation, or an admission of the facts of abuse by the perpetrator." *G.V. v.* [*Department of Public Welfare*], 91 A.3d 667, 671 ([Pa.] 2014) (quoting 23 Pa.C.S. § 6303(a)). Section 6303(a) of the [CPSL] defines "substantial evidence" as "[e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion." 23 Pa.C.S. § 6303(a). The "substantial evidence" standard set forth in Section 6303(a) of the [CPSL] is "the equivalent of the preponderance of the evidence standard." *T.H.*, 145 A.3d at 1198.

*S.H. v. Department of Human Services*, 228 A.3d 22, 27 (Pa. Cmwlth. 2020).

Under the CPSL, child abuse requires intentional conduct by the perpetrator. Relevantly, Section 6303(b.1) defines "child abuse" as follows:

> The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:
>
> (1) Causing bodily injury to a child through any recent act or failure to act.
>
> ****

11

(5) Creating a reasonable likelihood of bodily injury to a child through any recent act or failure to act.

23 Pa.C.S. § 6303(b.1).

## A. Issues 1-3

In her first three issues, Mother makes arguments based on an alleged lack of substantial evidence and the ALJ's application of *In re L.Z.* to conclude that she, and not Father, abused Child. According to Mother, the ALJ made numerous unsubstantiated "assumptions," including that because Child was in Mother's care, and Child was abused, then it must have been Mother who abused Child. (Mother's Br. at 14.)

Mother argues that in order to reach the conclusion that she abused Child, the ALJ "needed to cherry-pick her findings of fact to only those which were detrimental to [Mother] while ignoring those which were to her favor." *Id.* Specifically, in her first issue, she contends that, contrary to the ALJ's findings, Father admitted to being in the house on June 13, 2019, despite the existence of a no-contact order, and that he came to the house because Mother asked him to help with the children. She argues that Father made "an amazing string of ridiculous and self-contradicting statements," and yet was found "mostly credible" by the ALJ. *Id.* at 15. Specifically, he claimed to have been brought over to help with the children but then was kept from seeing them. Mother argues that Father's testimony that he had no contact with Child while at the house that night "makes no sense" because "it is inconceivable that [Father] would not see his baby when given the chance." *Id.* at 10. For these reasons, Mother argues, the ALJ erred by finding Father "mostly credible."

Mother urges that her "version [of events] makes immensely more sense than the plan for him to hide and then spend the night with a sick woman." *Id.* at 11.

12

She points to her own testimony that she asked Father to come over earlier in the day because of her illness but that he was to leave and go back to his own home after she dropped him off to pick up his car after a tire change. She indicated that she did not realize that he was even in the home until she finished putting her sons to bed and was surprised to find him alone with Child. When she went to take Child, he resisted, pulling Child by the legs and, effectively, causing the fractures.[3]

Mother contends that "all of this evidence creates a firm case that [Father] was the person who caused the injuries to [C]hild," and that the ALJ's finding that she abused Child amounted to no more than "speculation" that was not supported by substantial evidence. *Id.* at 18-19. Alternatively, Mother argues that the ALJ erroneously applied the rebuttable evidentiary presumption of abuse in Section 6381(d) of the CPSL, 23 Pa. C. S. § 6381(d), and *In re L.Z.* to conclude that because Child was abused, and because Child was in Mother's care at the time, Mother was the one who inflicted the abuse. Mother argues that the evidence demonstrated that Child was not solely in Mother's custody, having also spent time at daycare the day before the injury was diagnosed and, more importantly, was in the presence of Father, who had previously abused Child and been convicted of child abuse in relation to a prior incident. We disagree with Mother on all accounts.

a) Substantial Evidence

It is axiomatic that the Department "is the ultimate fact[ ]finder in expunction appeals" and is responsible for credibility determinations, *F.V.C. v. Department of Public Welfare*, 987 A.2d 223, 228 (Pa. Cmwlth. 2010).

---

[3] Mother concedes that the injuries were not caused by Child's leg being caught between the slats of the crib. (Mother's Br. at 20) ("Although she noted that the child's leg was caught in the slat of her crib, this clearly was not the cause of the injury"). Instead, she posits that the "scientific evidence" supports her version of events, that Child's legs were injured when Father pulled on them. *Id.*

13

"Absent an abuse of discretion, we will not disturb the [Department]'s determinations as to credibility and evidentiary weight." *R.J.W. v. Department of Human Services*, 139 A.3d 270, 285 (Pa. Cmwlth. 2016) (citing *F.V.C.*).

Here, the ALJ determined, despite Mother's testimony to the contrary, that it was not Father who caused Child's injuries. The ALJ concluded that Father did not have any interaction with Child on Thursday when he was at the residence. Specifically, the ALJ found:

> 10. Prior to picking up [C]hild and [her] siblings, [Mother] told [Father] to go to the bedroom and lock the door so children, including [C]hild[,] would not see him at the residence. (N.T. 87, 88, 91)
>
> 11. [Mother] put [C]hild and [her] siblings to bed and the following morning, [Father] left [Mother's] residence between 5:30 a.m. and 6:00 a.m. and went to work. (N.T. 88)
>
> 12. While at [Mother's] residence, [Father] did not have any contact with [C]hild or [her] siblings. (N.T. 88, 92)
>
> * * *
> 59. . . . [Mother] was the sole caregiver of [C]hild from Thursday, June 13, 2019, through Saturday, June 15, 2019. (N.T. 133, 134)

(Adjudication, at 5-6, 10; F.F. 10, 11, 12, 59; C.R. at 136-37, 141.)

The ALJ also did not find Mother credible. The ALJ did not believe Mother that (1) Father was only in the residence when children were not there; (2) he forced his way into the house and would not leave; (3) Father had contact with Child when he was at the residence on Thursday night; or (4) a tug-of-war involving Child took place between Mother and Father. The ALJ believed Father when he testified that

14

he was invited to the house by Mother, went directly to the bedroom, stayed until the morning, and did not see the children that night.

By arguing that her version of events "makes more sense" than Father's version, Mother is asking this Court to make credibility determinations and engage in factfinding. However, our review is limited to whether the findings of fact are supported by substantial evidence, not to reweigh or examine credibility determinations. *R.J.W.*, 139 A.3d at 280.

b) *In Re L.Z.*

Mother argues that the ALJ misapplied the presumption of abuse in Section 6381(d) of the CPSL and *In re L.Z.*

"Abuse" exists when a serious injury cannot be explained as accidental. 23 Pa.C.S. § 6303(b). Under Section 6381(d) of the CPSL, there is a rebuttable evidentiary presumption when a child sustains abuse not ordinarily suffered absent acts or omissions of a parent or other responsible party. Under such circumstances, "the fact of abuse suffices to establish *prima facie* evidence of abuse by the parent or person responsible." *In re L.Z.*, 111 A.3d at 1167. *Prima facie* evidence is "[s]uch evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, and which if not rebutted or contradicted, will remain sufficient." *Id.* at 1185 (citation omitted). To rebut the Section 6381(d) *prima facie* presumption, a parent or caregiver must provide evidence demonstrating that she did not inflict the abuse by testifying that she gave responsibility for the child to another person about whom she had no reason to fear or that the injuries were accidental rather than abusive. *Id.*

In *In re L.Z.*, the Supreme Court determined that, when applicable, the presumption of abuse in Section 6381(d) requires each parent or person responsible for

15

the child's care to provide "countervailing competent, substantial evidence" rebutting the presumption that he or she actually inflicted the injury or failed in their duty to protect the child. 111 A.3d at 1180.

Summarizing the medical evidence presented by CYS, the ALJ found that the injuries Child sustained were not accidental and that Child suffered physical child abuse. Therefore, the burden shifted to Mother to rebut the presumption. Although Mother provided five different theories as to how Child may have been injured, the ALJ did not believe any of them, because none of her theories were plausible explanations for the presence of "metaphyseal lesions" in both legs. The ALJ specifically discounted Mother's suggestion that Child sustained the double leg fractures at daycare, or while attempting to crawl at the shore with her maternal grandmother in early June or at the hands of her brother, C.M. Accordingly, the ALJ found that Mother failed to rebut the presumption that she was the one who committed child abuse upon Child.

Accordingly, we conclude that the ALJ's factual findings and credibility determinations are supported by the record. *Prima facie* evidence exists to apply Section 6381(d)'s presumption that Mother was a perpetrator of Child's abuse while Child was in Mother's custody when she sustained her non-accidental injuries that would not normally have been sustained without either actions or omissions of a parent or childcare provider. *See* 23 Pa.C.S.§ 6381(d). Moreover, we find that Mother failed to rebut the presumption, with substantial countervailing evidence, where Child's injuries were medically determined to be non-accidental and not self-inflicted, and Mother had custody of Child at the time she was injured.

Mother next argues that the ALJ erred by finding her indicated for abuse by her acts or omission because "the uncontroverted testimony" established that

16

Mother did not "allow" Father access to Child. (Mother's Br. at 5.) We reject this argument summarily. The "uncontroverted" evidence did not establish that Mother did not allow Father access to Child. This point was in dispute. Mother testified that Father appeared unannounced at the house after she took him back to the tire store. Father testified that was not true, and that he went straight to the bedroom and remained there until the next morning without ever having contact with the children. The ALJ accepted Father's account and not Mother's account. The ALJ was free to accept or reject the testimony of any witness, in whole or in part. *R.J.W.*, 139 A.3d at 280. That determination regarding credibility was solely within the province of the ALJ, not this Court. *Id.* We discern no abuse of discretion in these credibility determinations and will not disturb them on appeal.[4]

## B. Issue 4

In her final allegation of error, Mother argues that the ALJ erred by not allowing her counsel to interrogate Mr. Rush, whom she claims had a "bizarre fascination" with her. (Mother's Br. at 24.) She argues that "[d]espite handing this case over to a designated case worker, [Mr.] Rush remained heavily involved in the case, appearing at every hearing and being a constant voice in the case, even though it was not assigned to him," and that he "even went so far as to appear at a hearing, years after this case was resolved, involving [Mother] and a different father in a different county entirely to attempt to keep her from having access to her children." *Id.* at 16. She argues that she should have been permitted to explore Mr. Rush's bias against her.

---

[4] Mother also argues that the ALJ erred by finding her indicated for abuse by omission because she delayed taking Child for medical treatment. Her argument is based entirely on the unsubstantiated presumption that Father abused Child on Thursday and Child went to daycare the next day. The ALJ rejected that theory as not credible. Moreover, the ALJ did not make any finding or statement based on Mother's supposed delay in bringing Child to the hospital. Therefore, this issue is without merit.

17

As the caseworker on duty, Mr. Rush was the CYS worker who arrived at the hospital and conducted the initial interview with Mother and Dr. Doshi. He was then assigned to be the foster care worker for the children. Mother's counsel had every opportunity to cross-examine Mr. Rush regarding his roles in those capacities. Moreover, the ALJ heard evidence from Ms. Santin who testified about her independent and exhaustive investigation, which led CYS to the conclusion that Mother was the perpetrator of Child's abuse. Mother has utterly failed to present any legal authority related to Mr. Rush's supposed bias, let alone explain how that could affect the merits of the underlying investigation as to whether her acts or omissions led to Child's unexplained fractures in both legs. Accordingly, we find this issue to be without merit.

## IV. Conclusion

In sum, CYS presented credible expert medical testimony that Child was unquestionably the victim of physical child abuse while in Mother's custody. Further, Mother failed to rebut the presumption in 23 Pa. C.S. § 6381(d) that Child would not have ordinarily sustained these injuries except by reason of Mother's acts or omissions. *In re L.Z.*

_____
PATRICIA A. McCULLOUGH, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

H.W.,                                              :    ***CASES SEALED***
        Petitioner               :    ***CASES CONSOLIDATED***
                                                   :
        v.                       :    No. 275 & 276 C.D. 2024
                                                   :
Department of Human Services,                      :
        Respondent               :

## ***ORDER***

AND NOW, this 15th day of July, 2025, the February 12, 2024 order of the Department of Human Services is hereby **AFFIRMED.**

_____
PATRICIA A. McCULLOUGH, Judge